Schuck *v.* Murdock Acceptance Corporation.

4-9666                                    247 S. W. 2d 1

Opinion delivered February 11, 1952.

Rehearing denied March 31, 1952.

*Brooks Bradley* and *Tilghman E. Dixon,* for appellant.

*Owens, Ehrman & McHaney,* for appellee.

Griffin Smith, Chief Justice. The litigation resulting in this appeal stems from a controversy regarding

the balance claimed to be due on a note attached to a conditional sale contract executed by Kenneth L. Schuck June 4th, 1949.

H. E. Garrett operates a motor sales business and delivered to Schuck a 1947 model Buick automobile, listed by the seller as a used unit. The contract shows the total *time price* to have been $2,328, of which $600 was paid. The note and contract were printed in a single form with perforations for easy detachment. As to the note, Schuck's promise was to pay Garrett Motor Sales the principal sum of $1,728 in 24 installments of $72, ". . . with interest on each installment after its maturity at the highest lawful rate." Failure to pay according to the tenor of the note at the time specified matured all unpaid installments at the holder's election. The first note was due July 10, 1949.

Schuck and his wife completed their negotiations for the car after banking hours on Saturday—probably around four o'clock. Schuck testified that he had arranged for credit at Worthen Bank & Trust Co. whereby deferred payments could be made on a satisfactory interest basis; but, inferentially, the negotiations were tentative and the necessary fund to pay Garrett in full would not be available until the car could be pledged as security. Schuck was positive that the only price quoted was $1,795. It is not disputed that he traded an old car to Garrett for $400 and paid $200 in cash, leaving, as Schuck said he believed, a balance of $1,195.

In the hurry to close the deal papers were signed under an arrangement whereby Conditional Sales Contract No. 35680 was executed by Schuck. It is one of Murdock Acceptance Corporation's forms printed on blue paper bearing the monogram, "A Finance Service to Fit Your Needs." Murdock's name does not appear on the front of the document. Neither is it to be found on the attached note, upon which the words "Negotiable instrument," and "Be sure to sign on back in proper places," are printed in blackface capital letters. The back of the note contains two indorsement forms, *with* recourse, and *without* recourse, each followed by "Pay to the order

of Murdock Acceptance Corp.'' On the back of the contract proper, as distinguished from the note, certain statements are addressed to Murdock Acceptance Corporation, the one pertinent here being the dealer's recommendation, and assignment without recourse.

The contract recites that it is signed in duplicate and that one copy was retained by the purchaser on June 4th —the day executed. Garrett contends that with delivery all writing and figures were filled in, and that the misunderstanding springs from Schuck's refusal to concede that the *cash* price and the *time* price were different. Schuck insisted that the duplicate given him was printed on pink paper and that the figures now charged to him were $1,795 less $600. Garrett's explanation of the pink paper is that it was a slip used by a buyer in procuring state registration. However, he said that Murdock's present contracts are unlike the one used in 1949. Schuck testified that he lost the duplicate obtained when the car was purchased.

When Murdock acquired the note it had not been detached from the contract. The Acceptance Corporation's forms were left with Garrett and other dealers. The contract here shows ''Total time price, $2,328; paid [on delivery], $600; deferred balance, $1,728, payable [to Murdock] in installments of $72, . . . commencing July 10, 1949.'' Garrett concurrently executed a bill of sale containing a covenant that the car was ''clear from encumbrances.'' Schuck did not apply for a certificate of title until February 1, 1950, but the State Revenues Department at that time, on information Schucks says he supplied, registered the car under Schuck's name with notations that it was subject to a lien dated June 4, 1949, for $1,195. In his assertion that the only price mentioned by Garrett was $1,795 and that the balance should have been $1,195, Schuck was corroborated by his wife who testified that she heard all of the conversations, and that the duplicate Schuck received showed $1,795, less the down payments of $600. In summation, Schuck testified, in respect of the balance of $1,195, that he knew a charge of some character would be made for carrying

the paper, and for insurance. Within a week he received the formal papers showing the presumptive obligation to pay $72 for 24 months, but did not complain until the amount he thought he actually owed had been discharged.

In explaining, on cross-examination, an obviously obscure answer in which the word *you* was used, Schuck replied that he had in mind "the people that lent me the money." Question: "Nobody loaned you any money, did they?" A. "That is what they say, [but] not what I think." Q. "There was no transfer of money, was there—you saw no money?" A. "I saw the benefit of the money."

We think the entire question relating to usury— alleged in Schuck's complaint—depends upon the true character of the transaction. Although Garrett did not deny Schuck's statement that when the deal was pending the prospective purchaser remarked that he could finance the obligation through the bank at a cost of about $50, and that the reply was that the finance corporation's charges would be but slightly more—not over $50 additional—Garrett did admit that an agreement as to price was reached, and that Schuck was told that the accommodating company would not carry in excess of two-thirds of the total cash price. Schuck then said he wanted the longest permissible extension — at that time 24 months—and he understood that the monthly payments would be $72. A question put to Garrett was: "[Did you tell him] it would cost $72 a month for 24 months?" A. "And we never figured the payments until the deal was closed." Q. "When you told [Mr. and Mrs. Schuck] the amount of the monthly payments *over a period of 24 months,* did they take time to consider them?" A. "I don't know what they were considering, but they took a considerable amount of time."

On cross-examination Garrett unhesitatingly conceded that the cash price quoted Schuck was $1,795, and that the balance was $1,195. There was this explanation in response to an inquiry whether separate prices were quoted: "When I sold him—when the car—when the

deal was completed—when I filled this out right here, I don't remember whether I told him it was $2,328, or how that was. I told him he was paying $600 down and the balance would be 24 at $72; I don't remember whether the unpaid balance of $1,728 was brought out or not, [but] I am pretty sure it was. But the contract, the basis on which I traded, was $1,795. . . . We have one price marked cash and the other credit. We are in the wholesale business. We have a retail price and another price we can make. Naturally we are in it to make what—.''

When asked how much money Murdock returned (the term ''kickback'' was objected to) Garrett replied: ''They gave me a check for, let me see, about $66.'' Question: ''You are sure it wasn't $95.70?'' A. ''I would have to figure it.'' After some hesitation during which computations were seemingly made, the witness replied that he ''got a legal reserve'' of $91.40.

In substance, the testimony was that if the purchaser whose contract and note Murdock acquired paid in full, a ''special reserve'' of $24 was payable, in addition to $67.40. Emphasizing his pleasant relations with the finance corporation, Garrett testified that Murdock [''Would give me] $71.40 any time I requested it, and the rest I have to wait for. Any car could be turned back and the loss—that $24—would be wiped out.''

Garrett considered the payment a discount:—''They paid me $1,195, plus this $71.40. . . . The balance due me [by Schuck] was $1,728, and I sold [Murdock] the paper for $1,195 plus the reserve they paid me.'' A later explanation was: ''At the time I sold them the paper they gave me this—they gave me $1,276.40 and $24 for—''. . . . To this testimony Garrett added: ''At the end of the year they always make you a little present—I never did even figure it.'' Murdock required Garrett to check the credit rating of purchasers before the finance corporation would handle the paper.

An insurance policy sent to Schuck covers comprehensive liability and collision or upset, with $50 deductible, for which the two-year premium was $208. It

shows *actual cost [of the car] when purchased,* including equipment, $1,795, encumbered with $1,728. The difference of $67 is not accounted for by any affirmative testimony.

*First.*—Our cases are in harmony regarding the right of a seller to ask one price where cash is paid, and a higher price if credit is extended. The usury law is directed to an excessive charge for money. It is not necessary that both parties to a loan contract intend that an unlawful rate of interest be paid, for the contract is void if the lender alone charges or receives more than 10%. *Wilson* v. *Whitworth,* 197 Ark. 675, 125 S. W. 2d 112. Mutuality is not essential if the lender has the intent to receive more than the maximum mentioned in Art. 19, Sec. 13 of the Constitution, and the intent is reflected in the contract. Cases distinguishing money from property in making charges to which attention is directed by appellees (the Murdock Corporation and Garrett) are *General Contract Purchase Corporation* v. *Holland,* 196 Ark. 675, 119 S. W. 2d 535; *Garst* v. *General Contract Purchase Corporation,* 211 Ark. 526, 201 S. W. 2d 757; *Cheairs* v. *McDermott Motor Co.,* 175 Ark. 1126, 2 S. W. 2d 1111; *Harper* v. *Futrell,* 204 Ark. 822, 164 S. W. 2d 995; *Smith* v. *Kaufman,* 145 Ark. 548, 224 S. W. 978. Other decisions are of a kindred character.

In the Garst Case, *supra,* there was reference to the Harper-Futrell decision holding that a conditional sales contract was not void because computations on an interest basis yielded more than ten percent per annum. It was said that the carrying cost was not based on a loan of money, but was "a part of the . . . price which the purchaser agreed to pay." The cause was remanded for submission to a jury.

Appellees' contention, advanced by Garrett, that the note was increased from a net balance of $1,195 to $1,728 when it was ascertained that the sale was to be a credit transaction, is contradicted by the dealer's recommendations and the language of Garrett's assignment, in stating to Murdock that ". . . . the face value of said contract is owing by said buyer and that there is

no defense thereto; that *the listed cash selling price* was the amount for which said property was sold to said buyer, not including brokerage and insurance charges."

If this representation be correct—and it was the basis on which Garrett's transfer to Murdock was made —the automobile was not sold at an advanced price by reason of the time factor.

Under the contract Murdock could have waited until the last note fell due, or longer, if the corporation chose, and a higher demand for credit. We think it very likely that "twenty-four notes at $72" were discussed, but reasonable inferences suggest a probability that Schuck had in mind the only capital price that had been discussed and that it did not occur to him that the multiplied notes exceeded $1,795. Certainly there is no indication that in these conversations anyone contemplated that insurance and carrying charges would absorb the credit of $600 to which the buyer was admittedly entitled.

*Second.*—Murdock Acceptance Corporation was not an innocent purchaser. Garrett determined the credit rating of customers whose notes were to be taken by Murdock, although the latter had a right to reject where Garrett's judgment was in error. The agreements for refunds, and for the so-called reserve, were according to a pattern of intent showing mutuality of interests. The corporation's forms, in blank, were left with Garrett, and the seller not only parted with possession of the car before the notes passed to Murdock, but a certificate asserting that the motor company had not retained title and that it did not have a lien on the property was executed for presentation to the Department of Revenues. Although the information given by appellant in procuring the evidence of title registration, if considered in this litigation, would be in the nature of a self-serving declaration (not objected to), nevertheless Schuck stated that the balance due [inferentially] as of June 4, 1949, was $1,195.

*Third—The Notes, Interest, etc.*—In the absence of any contractual provision for interest other than 10%

## COMPARATIVE TABLE No. 1

| Month | Principal | Int. Payment Rate (10%) | Payment On Principal | Balance |
|---|---|---|---|---|
|  | $1,484.40 |  |  |  |
| 1 |  | $ 12.37 | $ 59.63 | $1,424.77 |
| 2 |  | 11.87 | 60.13 | 1,364.64 |
| 3 |  | 11.37 | 60.63 | 1,304.01 |
| 4 |  | 10.87 | 61.13 | 1,242.88 |
| 5 |  | 10.36 | 61.64 | 1,181.24 |
| 6 |  | 9.84 | 62.16 | 1,119.08 |
| 7 |  | 9.33 | 62.67 | 1,056.41 |
| 8 |  | 8.80 | 63.20 | 993.21 |
| 9 |  | 8.28 | 63.72 | 929.49 |
| 10 |  | 7.75 | 64.25 | 865.24 |
| 11 |  | 7.21 | 64.79 | 800.45 |
| 12 |  | 6.67 | 65.33 | 735.12 |
| 13 |  | 6.13 | 65.87 | 669.25 |
| 14 |  | 5.58 | 66.42 | 602.83 |
| 15 |  | 5.02 | 66.98 | 535.85 |
| 16 |  | 4.47 | 67.53 | 468.32 |
| 17 |  | 3.90 | 68.10 | 400.22 |
| 18 |  | 3.34 | 68.66 | 331.56 |
| 19 |  | 2.76 | 69.24 | 262.32 |
| 20 |  | 2.19 | 69.81 | 192.51 |
| 21 |  | 1.60 | 70.40 | 122.11 |
| 22 |  | 1.02 | 70.98 | 51.13 |
| 23 |  | .43 | 51.13 | 0 |
| (23) Excess |  | 20.44 |  |  |
| (24) " |  | 72.00 |  |  |
|  |  | $243.60 | $1,484.40 | $1,728.00 |

## COMPARATIVE TABLE No. 2

| Month | Principal | Effective Int. Rate 15.025 | Principal Payments | Balance |
|---|---|---|---|---|
|  | $1,484.40 |  |  |  |
| 1 |  | $ 18.59 | $ 53.41 | $1,430.99 |
| 2 |  | 17.92 | 54.08 | 1,376.91 |
| 3 |  | 17.24 | 54.76 | 1,322.15 |
| 4 |  | 16.55 | 55.45 | 1,266.70 |
| 5 |  | 15.86 | 56.14 | 1,210.56 |
| 6 |  | 15.16 | 56.84 | 1,153.72 |
| 7 |  | 14.45 | 57.55 | 1,096.17 |
| 8 |  | 13.72 | 58.28 | 1,037.89 |
| 9 |  | 13.00 | 59.00 | 978.89 |
| 10 |  | 12.26 | 59.74 | 919.15 |
| 11 |  | 11.51 | 60.49 | 858.66 |
| 12 |  | 10.75 | 61.25 | 797.41 |
| 13 |  | 9.98 | 62.02 | 735.39 |
| 14 |  | 9.21 | 62.79 | 672.60 |
| 15 |  | 8.42 | 63.58 | 609.02 |
| 16 |  | 7.63 | 64.37 | 544.65 |
| 17 |  | 6.82 | 65.18 | 479.47 |
| 18 |  | 6.00 | 66.00 | 413.47 |
| 19 |  | 5.18 | 66.82 | 346.65 |
| 20 |  | 4.34 | 67.66 | 278.99 |
| 21 |  | 3.49 | 68.51 | 210.48 |
| 22 |  | 2.64 | 69.36 | 141.12 |
| 23 |  | 1.77 | 70.23 | 70.89 |
| 24 |  | .89 | 71.11 | .22 * |
|  |  | $243.38 | $1,484.62 | $1,728.00 |

* Fractional item of 22 cents necessary to balance.

after maturity, we think it important to ascertain the difference between $1,276.40, plus insurance of $208—that is, the full amount Murdock was out—and what the corporation claims it was entitled to collect. Appended computations deal with this differential of $243.60. The first tabulation (left) begins with the total of $1,484.40 and assumes that the initial $72 note, when paid at the end of thirty days, was partly principal and partly interest. On a ten percent basis the yield would be $151.16, so the excess is $92.44. It equals $22.44 of the 23d note, and all of the last note. The second table (right) shows that the actual interest was 15.025%.

We conclude that there was an unauthorized charge in the nature of a device to evade usury, and the contract is unenforcible. So are the notes. Payments aggregating $1,152 were made before the suit was filed and the company's right to retain this money is not questioned. The trial court directed certain deposits by Schuck *pendente lite,* which of course will be returned to appellant. All costs will be borne by the appellees.

Reversed.

Mr. Justice WARD dissents.

Mr. Justice McFADDIN concurs.

ED. F. McFADDIN, Justice (concurring). *Sparks* v. *Robinson,* 66 Ark. 460, 51 S. W. 460, was a case involving usury; and parol evidence was permitted to show that the written instrument did not reflect the real transaction. The opinion was written by Justice WOOD, and he there said:

"The court was clearly justified in concluding that the instrument purporting to be a bill of sale, although absolute on its face, was intended by the parties as nothing more than a security for the money advanced."

. . .

"The law shells the covering, and extracts the kernel. Names amount to nothing when they fail to designate the facts. We are of the opinion that the court was justified in concluding that the papers called 'bill of sale' and 'sale

tickets' were nothing more or less than a shift for a usurious loan of money.''

When we ''shell the covering'' in the case at bar, it is clear to me that Garrett did not act as a seller of commercial paper to Murdock, but acted as the agent of Murdock in making the loan to Schuck; that such loan was at a usurious rate of interest; and that the agency of Garrett for Murdock is the distinguishing point in this case. So I desire, first, to comment on the general principles of agency; then point out where agency was discussed in the briefs of the parties; and then to point to the evidence of agency in this case.

In 2 Am. Jur. 13, agency is defined:

''An agency may be defined as a contract either express or implied upon a consideration, or a gratuitous undertaking, by which one of the parties confides to the other the management of some business to be transacted in his name or on his account, and by which that other assumes to do the business and render an account of it. This is comparable with the definition of agency as adopted by the American Law Institute. That definition is as follows: 'Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' ''

Garrett did not have to work *exclusively* for Murdock to be its agent. He could be the agent of Murdock to make loans at the same time he was engaged in selling cars. Neither did the agency have to be created by any special formality. In 2 Am. Jur. 25, in discussing the modes of creating an agency, this is stated:

''As between principal and agent, the creation of the agency relationship arises from the consent of the parties. It is not essential that any actual contract should be expected by the agent; and while the relation, in its full sense, arises out of a contractual or gratuitous agreement between the parties, yet the agency and the assent of the parties thereto may be either express or implied.

"An expressly created agency may be a product of the oral or written agreement of the parties. An implied agency is also an actual agency; it is a fact which is to be proved by deductions or inferences from other facts and circumstances. It is often established from the words and conduct of the parties and the circumstances of the particular case. For example, an agency may be implied from prior habits or from a course of dealings of a similar nature between the parties, especially where the agent has repeatedly been permitted to perform similar acts in the past."

An interesting case on agency is *Vaughan* v. *Hinkle,* 131 Ark. 197, 198 S. W. 705. In that case, Crownover and Cole bought some cattle, as agents of Hinkle, and gave Vaughan a check for the cattle. Hinkle denied the agency. Judge WOOD said that agency was a question of fact, and that a fact case was made for the jury. The Hinkle case supports the views I am here expressing.

The question of Garrett being Murdock's agent was presented in the original briefs in this case:

(a) In Schuck's (appellant's) original brief, this appears:

"Who was Garrett, the dealer, acting for? He was acting for Murdock and was Murdock's *agent* because he used Murdock's forms, rate charts, obtained the credit references of the buyer and phoned them to Murdock and he did not complete the sale until Murdock had agreed to handle same, and same met with Murdock's approval, all this in advance. Murdock gave the dealer, Garrett, a bonus each year (Tr. 68, 69). Garrett got from Murdock the unpaid balance of the cash price plus $71.40 for handling the paper" (Tr. 67).

(b) Likewise, in Murdock's (appellee's) original brief, this appears:

"Appellant also suggests that Garrett was the agent of Murdock Acceptance Corporation, yet he can point to no fact indicating agency. The evidence affirmatively shows that Garrett did not act for Murdock; that Mur-

dock purchased notes from Garrett only if it desired to do so; that Murdock would not purchase notes which it thought were inadequately secured (Tr. 69, 72, 73). Murdock had nothing whatever to do with the business conducted by Garrett (Tr. 73, 74). Garrett was a car dealer. He fixed the prices on the automobiles sold by him. In this Murdock had no interest whatever. It is true that Murdock informed Garrett of the rates of discount it would apply to notes purchased by it, but that is done by all banking institutions. The fact that these discount rates were furnished in advance does not affect the question of agency. This was done for the convenience of the parties in their mutual dealings."

Here is some of the evidence relating to the agency of Garrett for Murdock in the case at bar:

(a)   Garrett had all of Murdock's forms and rate charts in his office.

(b)   Before filling out the forms, Garrett obtained from Schuck his credit references, and Garrett phoned Murdock to ascertain if Schuck's credit was good and if Murdock would handle Schuck's paper.

(c)   Murdock informed Garrett that Schuck's credit was good, and that Murdock would handle the paper.

(d)   Only after Murdock's consent was obtained did Garrett complete the transaction with Schuck, and in completing the transaction, Garrett used the forms and rate charts furnished him by Murdock.

(e)   Murdock gave Garrett a bonus each year for his services.

(f)   Furthermore, Garrett received from Murdock $71.40 for his services.

I maintain that this evidence establishes Garrett's agency for Murdock; and that the plea of "selling paper at a discount" is only a cloak to hide the usurious loan.

So I conclude that the *agency* point differentiates the Murdock case from our other cases involving the sale of contracts and notes for automobiles; and the pur-

pose of this concurring opinion is to call special attention to this differentiation.

WARD, J., (dissenting). The decisive issue in this case narrows itself to a very fine point.

It calls for an answer to this question: Did Schuck believe, with good reasons, he was buying the car for $1,795. We say this because that is the only figure contended for by him.

It is undisputed that the first price quoted was $1,795 and that this was a cash price, and it is further undisputed that they did not pay cash. Appellant and his wife say positively no other price was ever discussed or mentioned. They do admit they first expected to pay cash and also admit they expected to pay some more if they bought under the terms later approved, but, they say, they did not expect to pay much more—possibly fifty or sixty dollars. Appellant says he signed somekind of a contract which stated the price was $1,795 but was unable to produce it.

On behalf of the defendants we have the following testimony and exhibits: First. Garrett, the salesman, says he is a wholesaler of cars; that he has a cash price and a credit price; that after the cash price was quoted and not acted upon he told appellants that the terms price would be (after deducting down payments) 24 payments of $72 each. This amount ($1,728) of course bore no interest and included all carrying charges. It is not contended otherwise. Second. The Conditional Sales Contract was exhibited in evidence showing (a) the Total Time Price, (b) the deductions, and (c) the deferred balance. Appellants admit they understood they were to pay 24 payments of $72 each. Schuck admits he looked at his insurance policy a few days later and that it showed the encumbrance to be the same as the deferred balance on the Sales Contract. Third. The said Sales Contract bears appellant's signature which he does not question. Fourth. Attached to the Sales Contract is a note for $1,728 payable in 24 monthly installments of $72

each and appellant's signature (unquestioned) appears at the bottom.

Appellant says said Sales Contract was not filled out when he signed it. Nothing is said about the note. Appellant is a civil engineer and presumably an educated man.

It is my opinion there is ample evidence to show appellants knew or should have known they were not buying the car at the cash price mentioned above. Certainly there is sufficient evidence to sustain the chancellor's finding in favor of appellees.

That the burden of proving usry is on the person alleging it, is too well established by the decisions of our courts to require citations. Our court has gone further, in *Briggs* v. *Steele,* 91 Ark. 458 (p. 462), 121 S. W. 754, and said: "The wrongful acts of usury will never be imputed to the parties, and it will not be inferred when the opposite conclusion can be reasonably and fairly reached." Citing a list of cases.

Ordinarily a dissenting opinion on a question of facts can be productive of very little value but here the majority opinion, it seems to me, portends such deleterious effects to the usual and necessary transactions in commercial paper as to justify this warning. If the acceptance corporation is to lose money if paid for appellant's note under the facts in this case, then it appears that hereafter such an agency must require from the purchasers of all cars an affidavit that they knew and understood the price they were to pay. Perhaps then they would not be safe, for it seems an affidavit would be no more effective than a signed note.