HARE *v.* GENERAL CONTRACT PURCHASE CORPORATION.

4-9723                                                    249 S. W. 2d 973

Opinion delivered May 26, 1952.

Rehearing denied June 30, 1952.

*P. L. Smith,* for appellant.

*Guy B. Reeves,* for appellee.

ED. F. McFADDIN, Justice. This case involves the issue of usury in connection with a sale.[1]

Appellant, Clyde Hare, purchased a used truck from Earl Meeks, a second-hand automobile dealer in Arkadelphia, for $1,750. After making a cash payment of $100, and trading in a car for a credit of $500, the balance due by Hare to Meeks was $1,150. To handle this balance, Hare executed to Meeks a title retaining contract and note for $1,439.13. The note and contract were on forms supplied Meeks by appellee, General Contract Purchase Corporation; and Meeks and Hare understood that the said $1,150 was increased $289.14 to take care of insurance, interest and service charges on the delayed payments; and that the note for $1,439.13 was payable $68.53 per month for twenty-one months.

A day or two after the completion of the trade between Meeks and Hare, Meeks transferred the title retaining contract and note to the General Contract Purchase Corporation, without recourse, and received $1,150. Hare made six of the monthly payments to General Contract Purchase Corporation, and then filed suit alleging usury, and claiming the relief stated in § 68-609 *et seq.* Ark. Stats. The General Contract Purchase Corporation, for its defense, claimed:

I. That General Contract Purchase Corporation was a *bona fide* purchaser, for value, without notice, and was, therefore, a holder in due course of the Hare note, and that the claim of usury was unavailable against such holder.

---

[1] Recent cases of this Court involving somewhat related phases of usury are *Schuck* v. *Murdock Acceptance Corp., ante,* p. 56, 247 S. W. 2d 1; *Winston* v. *Personal Finance Co.* (Case No. 9760), *ante,* p. 580, 249 S. W. 2d 315, opinion delivered May 19, 1952; *Strickler* v. *State Auto Finance Co.* (Case No. 9791), *ante,* p. 565, 249 S. W. 2d 307, opinion delivered May 19, 1952. Annotations involving usury are contained in 91 A. L. R. 1105 and 143 A. L. R. 238.

II. That the contract price of the truck was increased from $1,750 for a cash sale, to $2,039.13, because it was a credit sale.

III. That the difference between the face of the note ($1,439.13) and the balance of the truck trade ($1,150) represented two items: one being $148.24, which was the amount of insurance premium, and the other being $140.89, which was not only for interest but for service charge; and that such service charge has been approved by this Court.

The Chancery Court refused Hare's plea of usury, and entered a decree for General Contract Purchase Corporation; and from that decree, Hare has appealed. We discuss the defenses of General Contract Purchase Corporation in the order listed.

I. *Bona Fide Holder*. This defense is without merit. If the note be in fact usurious, then transferring it to a *bona fide* purchaser would not improve the situation. Our Constitution (Art. 19, § 13) provides:

"All contracts for a greater rate of interest than ten per cent per annum shall be void, as to principal and interest, and the General Assembly shall prohibit the same by law; . . ."

In the case of *German Bank* v. *DeShon*, 41 Ark. 331, this Court held that a note usurious in the hands of the payee is also usurious in the hands of a subsequent purchaser, though he purchased in good faith, before maturity of the note, and without any notice of the usury; and that the reason for such holding is that the Constitution makes a usurious note void, and therefore, it can gain no validity by circulation. The case of *German Bank* v. *DeShon* is an outstanding decision in our reports, and has been consistently followed. Under that holding—which we now reaffirm—the defense of *bona fide* holder, for value, without notice, is without merit against the plea of usury.

II. *Increased Selling Price Because of Credit Sale.* Appellee says that the price of the truck was increased

because the truck was sold on credit and appellee claims that there are many cases from this Court,[2] and from other jurisdictions,[3] which permit a "credit price", as distinguished from a cash price. The cases cited by appellee sustain the general theory, but even the credit price may be attacked as a cloak for usury.[4]

But the facts in the case at bar disclose that there was never any "credit price" actually stated. We have before us the original Conditional Sales Contract between Hare and Meeks, and it recites:

"Total cash price of automobile and all extra
    equipment ................................................................................$1750.00
Cash on or before delivery ........................$100.00
Allowance on car traded in ........................ 500.00

Total down payment ................................................................ 600.00

Deferred Balance of Cash Price ........................................ 1150.00
Time Price Differential (Including any In-
    surance), ........................................................................ 289.13

Balance of Time Price ................................................................$1439.13

Which said balance of time price is payable in 21 consecutive equal monthly installments of $68.53 each."

On the reverse side of the original contract, there is the assignment from Meeks to General Contract Purchase Corporation and *also* an affidavit, duly acknowledged by Hare and Meeks, which, omitting signatures and acknowledgment, reads:

"The undersigned Purchaser and Seller of the within motor vehicle hereby swear and affirm that the

[2] Some of our cases so holding are: *Brakefield* v. *Halpern*, 55 Ark. 265, 15 S. W. 190; *Blake* v. *Askew*, 112 Ark. 514, 166 S. W. 965; and *Smith* v. *Kaufman*, 145 Ark. 548, 224 S. W. 978.

[3] Cases so holding are collected in Annotations in 48 A. L. R. 1442 and 57 A. L. R. 880. See, also, 55 Am. Jur. 338.

[4] *Ford* v. *Hancock*, 36 Ark. 248; *Grider* v. *Driver*, 46 Ark. 50; *Tillar* v. *Cleveland*, 47 Ark. 287, 1 S. W. 516; *Ellenbogen* v. *Griffey*, 55 Ark. 268, 18 S. W. 126. See, also, 55 Am. Jur. 341 *et seq.* and Annotation in 104 A. L. R. 245.

within Conditional Sales Contract is *bona fide,* given to secure an unpaid just debt of $1150.00 due from Purchaser to Seller . . ."

From the foregoing, and from other evidence in the record, it is clearly established that the truck was priced at $1,750, and that there was no "credit price", as distinguished from the $1,750. There is no fact in this record which makes applicable the rule of a *bona fide* credit price. Therefore, we need not discuss credit price as a cloak for usury any further than is discussed in the subsequent topics of this opinion.

III. *Interest and Service Charge.* Thus, we come to appellee's final defense, which, as previously stated, is that the $140.89 was not only for interest, but for a service charge in connection with the sale of the truck. The balance on the truck was $1,150, and the insurance premium was $148.24, so the debt was $1,298.24. But the note was for $1,439.13. The question is whether such interest and service charge, which when added together exceed 10%,[5] make the transaction usurious. It is clear:

---

[5] Here is the calculation which shows the interest rate to be 11.5%, if monthly payments of $68.53 had been made as contracted:

| | |
|---|---|
| 21 Monthly Payments at $68.53 | $1,439.13 |
| Principal | 1,298.24 |
| Interest | $ 140.89 |

Effective Interest Rate 11.5%

| Contracted Payments of $68.53 each | Interest Payments | Principal Payments | Balance Principal |
|---|---|---|---|
| 1st month | $12.44 | $56.09 | $1,242.15 |
| 2nd " | 11.90 | 56.63 | 1,185.52 |
| 3rd " | 11.36 | 57.17 | 1,128.35 |
| 4th " | 10.81 | 57.72 | 1,070.63 |
| 5th " | 10.26 | 58.27 | 1,012.36 |
| 6th " | 9.70 | 58.83 | 953.53 |
| 7th " | 9.14 | 59.39 | 894.14 |
| 8th " | 8.57 | 59.96 | 834.18 |
| 9th " | 7.99 | 60.54 | 773.64 |
| 10th " | 7.41 | 61.12 | 712.52 |
| 11th " | 6.83 | 61.70 | 650.82 |
| 12th " | 6.24 | 62.29 | 588.53 |
| 13th " | 5.64 | 62.89 | 525.64 |
| 14th " | 5.04 | 63.49 | 462.15 |
| 15th " | 4.42 | 64.11 | 398.04 |
| 16th " | 3.81 | 64.72 | 333.32 |
| 17th " | 3.19 | 65.34 | 267.98 |

| | | | | |
|---|---|---|---|---|
| 18th | " | 2.57 | 65.96 | 202.02 |
| 19th | " | 1.94 | 66.59 | 135.43 |
| 20th | " | 1.30 | 67.23 | 68.20 |
| 21st | " | .65 | 67.88 | ----- |
| | | 141.21 | 1,297.92 | |
| | | —.32 | .32 | |
| | | $140.89 | $1,298.24 | |

(a) that Hare and Meeks agreed that $289.13 would be added to the $1,150, in order to cover insurance, interest, and carrying charges; (b) that the parties thought the $289.13 listed as "time price differential (including any insurance)", was a perfectly legal addition, and; (c) that it was not until months after the trade was made and after Hare claimed usury, that it was ascertained that the insurance premium was $148.24, and the interest and other charges were $140.89.

The evidence fails to show that Meeks acted as the agent of General Contract Purchase Corporation in this case, so there was a sale by Meeks to Hare, and the transfer of the note and papers by Meeks to General Contract Purchase Corporation. The question is whether such "time price differential" is legally permissible against the plea of usury even when there is a sale on which to predicate such increased price.

In a long line of cases, we have permitted the seller, under one guise or another, to do exactly what was done in the case at bar, and we have permitted the transferee of the paper to recover in just such a situation. Some of such cases are: *Garst* v. *General Contract Purchase Corp.*, 211 Ark. 526, 201 S. W. 2d 757; *Harper* v. *Futrell*, 204 Ark. 822, 164 S. W. 2d 995, 143 A. L. R. 235; *General Contract Purchase Corp.* v. *Holland*, 196 Ark. 675, 119 S. W. 2d 535; *Cheairs* v. *McDermott Motor Co.*, 175 Ark. 1126, 2 S. W. 2d 1111; *Standard Motors* v. *Mitchell*, 173 Ark. 875, 298 S. W. 1026, 57 A. L. R. 877; and *Smith* v. *Kaufman*, 145 Ark. 548, 224 S. W. 978.

In the case at bar, the parties dealt on the strength of the aforesaid holdings, which have become a rule of property, and we must not overrule these cases retro-

actively.[6] Therefore, insofar as the case at bar is concerned, it must be affirmed on the strength of our previous holdings.

IV. *Caveat.* But the time has come when we must reexamine these holdings, so we now give the public a *caveat*[7] that the effect of transactions, such as in the case at bar, may impinge on the constitutional mandate against usury, and transactions entered into after this appeal becomes final, may be subjected to the taint of usury with the aforementioned decisions affording no protection. Illustrative of our earlier holdings in this regard, we call attention to two cases. In *Ford* v. *Hancock*, 36 Ark. 248, there had been a credit sale of chattels, with a note and mortgage to secure the seller. The buyer pleaded usury in the sale, and that plea was successful. This Court said:

"It is not usury for one who sells a piece of property on credit, to contract for a higher price than he would have sold it at for cash. If the intention be, in fact, to sell on credit, he has the right to fix a price greater than the cash price, with legal interest added; but if the sale be really made on a cash estimate, and time be given to pay the same, and an amount is assumed to be paid greater than the cash price, with legal interest, would amount to, this is an agreement for forbearance that is usurious. Therefore, where the intention is not apparent, it is a question for the jury to determine, whether it was a *bona fide* credit sale, or a device to cover usury. Tyler on Usury, 92."

Likewise, in *Tillar* v. *Cleveland*, 47 Ark. 287, 1 S. W. 516, the Court used pertinent language. Cleveland sought to borrow $270 from Tillar in order to buy some

---

[6] In 85 A. L. R. 262, there is an Annotation on overruling cases with only prospective effect.

[7] In *Robinson* v. *Means*, 192 Ark. 816, 95 S. W. 2d 98, we gave a *caveat* that we were reëxamining our holdings on waiver of venue by appeal, and *Anheuser-Busch* v. *Manion*, 193 Ark. 405, 100 S. W. 2d 672, was the result.

Again in *Porter* v. *Porter*, 209 Ark. 371, 190 S. W. 2d 440, we stated that our previous holdings on residence in divorce cases had become "controversial"; and *Casson* v. *Casson*, 211 Ark. 582, 201 S. W. 2d 585, was the result.

property. But Tillar insisted on taking title to the property and then selling it to Cleveland for $360. This Court held that Tillar had used the deed and contract of sale to accomplish usury; and the language of Chief Justice MARSHALL was quoted with approval:

"Yet it is apparent that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the statute would become a dead letter. Courts, therefore, perceived the necessity for disregarding the form, and examining into the real nature, of the transaction. If that be in fact a loan, no shift or device will protect it."

The way the Finance Company operated in the case at bar is in many respects similar to the way Tillar operated in the reported case. Our cases disclose that finance companies have seized upon the "credit price rule" as a means of obtaining more than a 10% return upon what is in form a sale, but is in substance, a loan. It is obvious that if a prospective purchaser of a car, radio, refrigerator, etc., should borrow $1,000 directly from a finance company, then buy the article with the money and execute a one-year note to the finance company for $1,200, such transaction would be usurious. But the finance companies are accomplishing the same result by having dealers in cars, radios, refrigerators, etc., handle the sale in the first instance, and under the guise of a credit price, add an excessive charge which inures to the finance company, because the dealer is reasonably confident in advance of the sale that he can transfer the papers to the finance company for his own cash price. Thus, the finance company is getting the benefit of the increase. Nor is the increase purely for credit risk, because the car, radio, refrigerator, etc., is usually insured against normal hazards.

The result is that, by the simple expedient of providing forms and a rating book to the seller, and buying the conditional sales contract and note from him, the finance companies are receiving a usurious rate of interest. We cannot permit the constitutional mandate

against usury to be circumvented and evaded in any such manner. The doctrine of *stare decisis* prevents us from overruling our previous holdings with a retroactive effect;[8] so the case at bar must be affirmed. But the constitutional mandate against usury can no longer be chiseled away by opinions gradually following the previous holdings more and more away from the spirit of the Constitution.

Buying at a credit price, as distinguished from a cash price, has largely disappeared in fact, but is being used as a cloak for usury in many cases by such words as "time price differential", or some other such language. We, therefore, give this *caveat* to the public generally:

(1) We leave unimpaired the doctrine that a seller may, in a *bona fide* transaction, increase the price to compensate for the risk that is involved in a credit sale. But there may be a question of fact as to whether the so-called credit price was *bona fide* as such, or only a cloak for usury.

(2) If the seller, whether he has quoted two prices to the purchaser or not, subsequently transfer the title documents to an individual or company which is engaged in the business of purchasing such documents, at a price which permits the transferee to obtain more than a return of 10% on its investment, then a question of fact arises as to whether the seller increased his cash price with the reasonable assurance that he could so discount the paper to such individual or finance company. If that reasonable assurance existed, then the transaction is in substance a loan, and may be attacked for usury.

(3) When finance companies or purchasers of title paper supply dealers with a set of forms and a schedule for credit price increases, such will tend to show that the dealer had reasonable assurance that such finance company or purchaser of the paper would take the paper at such discount.

---

[8] See Annotation in 85 A. L. R. 262.

What we are trying to do is, to keep the spirit of the constitutional mandate against usury abreast of present day commercial transactions. We give this *caveat* prospectively, so as not to entrench on property rights acquired by reason of our previous opinions, and this *caveat* applies to all transactions entered into after this opinion becomes final.

The Chief Justice concurs in part and dissents in part.