CRISCO v. MURDOCK ACCEPTANCE CORPORATION.

5-71                                          258 S. W. 2d 551

Opinion delivered May 11, 1953.

Rehearing denied June 22, 1953.

*Josh W. McHughes, Brooks Bradley* and *Tilghman E. Dixon,* for appellant.

*Lowell W. Taylor* and *Owens, Ehrman & McHaney,* for appellee.

ROBINSON, Justice. Appellant Crisco bought an automobile on a conditional sales contract from James Hampton, d/b/a Public Auto Company. Hampton assigned the contract without recourse to Murdock Acceptance Corporation; later Crisco filed suit in the Pulaski Chancery Court to cancel the instrument on the ground that a usurious rate of interest had been charged. There was a decree in favor of Hampton and the finance company. However, Crisco was allowed a credit for an overcharge of $45. Crisco has appealed maintaining that the contract is usurious and therefore void, and the finance company has cross-appealed, contending that the Court erred in giving the $45 credit.

According to the evidence, Crisco saw the automobile advertised in a newspaper for the sale price of $1,475. He went to look at the car, and it had a sales tag attached for that amount. He was also told by the salesman the price was $1,475 and no other sales price was mentioned. Upon making the purchase, he was furnished an invoice signed by Homer Jones, Hampton's agent, which described the car and stated the cash price of $1,475, a time price differential of $326, and a total time price of $1,801. Crisco also signed the invoice. The transaction took place on Saturday, April 5, 1952; and although the contract itself does not show the date of the assignment to Murdock Acceptance Corporation, it must have been done immediately because on Monday, April 7, a policy of insurance covering fire, theft, etc., was issued by the Central National Insurance Company, and Murdock Acceptance Corporation is named in the loss payable clause. The selling price as shown on the insurance policy is $1,425; apparently this was meant for $1,475 as written

figures on the invoice can be easily mistaken for $1,425 instead of $1,475; but in any event it certainly was not meant for $1,801.

Over cross-appellant's objection, Crisco testified that the agreement was that he would receive a credit of $900 on a car he was trading in; however, the invoice and contract show a credit of only $855.

In addition to the policy of insurance covering the automobile, the Credit Life Insurance Company of Springfield, Ohio, issued a policy insuring Crisco's life in the sum of $1,116 and providing indemnity for loss of time by reason of sickness or accident in the sum of $62 per month. The policy covered a period of 18 months and the premium was $39.06. The premium on the automobile policy was $112, making a total in premiums of $151.06 on the policies issued. The "differential" named in the invoice was $326.

Crisco testified that he owed $170 on the car he was trading in, which according to the terms of the sale was assumed by Hampton. Hence when the $170 is deducted from $855, $685 is left to apply on the purchase price of $1,475. Deducting $685 from $1,475 leaves Crisco owing $790. Adding the $326 "differential" to the $790 makes a total of $1,116. The balance due as stated in the contract is $1,116 payable in 18 installments of $62 each.

All of this proves that Hampton used the $1,475 cash price as a basis upon which to compute the so-called "differential." The evidence is convincing that Hampton did not have a credit price of $1,801 set up on his automobile. He deducted the down payment from the cash price, and then according to some formula he made a charge for carrying the balance for a period of 18 months; he added the amount determined by the formula he used to the balance owed on the $1,475 after giving credit for the down payment; and this amount totalled $1,116.

The problem of usury is one that has existed as far back as we have any records; about as fast as man has been able to make laws against usury, schemes have been

devised to evade those laws. The framers of our Constitution attempted to guard against usury by Art. 19, § 13 of the Constitution which provides as follows: "All contracts for a greater rate of interest than 10 per cent per annum shall be void, as to principal and interest, and the General Assembly shall prohibit the same by law; but when no rate of interest is agreed upon, the rate shall be six per centum per annum."

Ark. Stat., § 68-602 provides: "The parties to any contract, whether the same be under seal or not, may agree in writing for the payment of interest not exceeding ten (10) per centum per annum on money due or to become due."

Ark. Stat., § 68-603 provides: "No person or corporation shall, directly or indirectly, take or receive in money, goods, things in action, or any other valuable thing, any greater sum or value for the loan or forbearance of money or goods, things in action, or any other valuable thing, than is in section one (§ 68-602) of this act prescribed."

Ark. Stat., § 68-609 provides: "Every lien created or arising by mortgage, deed of trust or otherwise, on real or personal property, to secure the payment of a contract for a greater rate of interest than ten (10) per centum per annum, either directly or indirectly, and every conveyance made in furtherance of any such lien is void; and every such lien or conveyance may be cancelled and annulled at the suit of the maker of such usurious contract, or his vendees, assigns or creditors. The maker of a usurious contract may by suit in equity against all parties asserting rights under the same, have such contract and any mortgage, pledge or other lien, or conveyance executed to secure the performance of the same, annulled and cancelled, and any property, real or personal, embraced within the terms of said lien or conveyance, delivered up if in possession of any of the defendants in the action, and if the same be in the possession of the plaintiff, provision shall be made in the decree in the case removing the cloud of such usurious lien, and conveyances made in furtherance thereof, from the

title to such property. Any person who may have acquired the title to, or an interest in, or lien upon such property by purchase from the makers of such usurious contract, or by assignment or by sale under judicial process, mortgage or otherwise, either before or after the making of the usurious contract, may bring his suit in equity against the parties to such usurious contract, and any one claiming title to such property by virtue of such usurious contract or, may intervene in any suit brought to enforce such lien, or to obtain possession of such property under any title growing out of such usurious contract, and shall by proper decree have such mortgage, pledge or other lien, or conveyance made in furtherance thereof, cancelled and annulled in so far as the same is in conflict with the rights of the plaintiff in the action.''

Ark. Stat., § 68-611 provides: ''Neither the maker of a usurious contract nor his vendees, assigns or creditors, or any other person who may have or claim an interest in any property embraced within the terms of such usurious contract, shall be required to tender or pay any part of the usurious debt or interest as a condition of having such contract, and any conveyance, mortgage, pledge or other lien given to secure its payment or executed in furtherance thereof, enjoined, cancelled and annulled, and any rule of law, equity or practice to the contrary is hereby abrogated.''

In the early case of *Ford* v. *Hancock*, 36 Ark. 248, it was said: ''Usury is a corrupt agreement for more than the legal rate of interest on a loan of money, or for the forbearance of a debt. It is not usury for one who sells a piece of property on credit, to contract for a higher price than he would have sold it for cash. If the intention be, in fact, to sell on credit, he has the right to fix a price greater than the cash price, with legal interest added; but if the sale be really made on a cash estimate, and time be given to pay the same, and an amount is assumed to be paid greater than the cash price, with legal interest, would amount to, this is an agreement for forbearance that is usurious. Therefore, where the in-

tention is not apparent, it is a question for the jury to determine, whether it was a *bona fide* credit sale, or a device to cover usury.''

In *Standard Motors Finance Co.* v. *Mitchell Auto Co.,* 173 Ark. 875, 293 S. W. 1026, 57 A. L. R. 877, it was held that charging a price more than ten per cent greater for an article sold on credit than would have been charged had the sale been for cash, does not constitute usury. *Ford* v. *Hancock* is cited with approval but nothing is said about the language in that case, ''. . . but if the sale be really made on a cash estimate, and time be given to pay the same, and an amount is assumed to be paid greater than the cash price, with legal interest, would amount to, this is an agreement for forbearance that is usurious.''

*Cheairs* v. *McDermott Motor Co.,* 175 Ark. 1126, 2 S. W. 2d 1111, also cites *Ford* v. *Hancock* with approval, but loses track of the following language from that case: ''Therefore, where the intention is not apparent, it is a question for the jury to determine, whether it was a *bona fide* credit sale, or a device to cover usury.''

In *General Contract Purchase Corp.* v. *Holland,* 196 Ark. 675, 119 S. W. 2d 535, it is said: ''The fact that the difference between the cash price of the LaSalle car purchased by appellee and the credit price amounted to more than 10 per cent per annum on the cash price would not make the note usurious. There is nothing in the law that will prevent a dealer from charging a higher price when he sells his goods on time than he would have charged if the purchase price had been paid in cash. The amount of the increase in price is not limited by the law, but it depends upon the agreement of the parties.'' No authority is cited, and the language in *Ford* v. *Hancock* to the effect that if the sale be really made on a cash estimate or where the intention is not apparent it is a question for the jury to determine whether it is a *bona fide* credit sale or a device to cover usury is not mentioned.

In *Harper* v. *Futrell,* 204 Ark. 822, 164 S. W. 2d 995, the Court said: ''This Court has held that the finance

charges in connection with the sale of property under a conditional sales contract are not paid for a loan of money, but are a part of the purchase price which the purchaser agreed to pay, and that there is no usury in a transaction of this kind.'' Citing *Cheairs* v. *McDermott Motor Co., supra.*

Thus it will be seen that although *Ford* v. *Hancock* has been cited with approval all along as authority for a credit price more than 10 per cent greater than a cash price not being usurious, the language in that opinion, ''. . . but if the sale be really made on a cash estimate, and time be given to pay the same, and an amount is assumed to be paid greater than the cash price, with legal interest, would amount to, this is an agreement for forbearance that is usurious. Therefore, where the intention is not apparent, it is a question for the jury to determine, whether it was a *bona fide* credit sale, or a device to cover usury,'' has gradually been lost sight of.

In the case of *Schuck* v. *Murdock Acceptance Corp.,* 220 Ark. 56, 247 S. W. 2d 1, the purchase price of the automobile as shown by the contract appeared to be $2,328; but the loan company who purchased the title-retaining note from the automobile company obtained an insurance policy which showed the actual cost of the automobile when purchased, including equipment, to be $1,795. The loan company paid $1,276.40 for a $1,728 note at the time of purchase, and $24 at a later date. It was found in that case that as a matter of fact $1,795 was the selling price of the automobile, and there was a trade-in of an old car of $400 and $200 paid in cash, making a down payment of $600, leaving a balance of $1,195; and that on such balance interest was charged at the rate of 15.25%; and that the contract showing a total price of $2,328 was a device to cover usury.

Immediately following the Schuck case, we had *Hare* v. *General Contract Purchase Corp.,* 220 Ark. 601, 249 S. W. 2d 973. It then appeared that the language in such cases as *Cheairs* v. *McDermott* had given the impression that a sale could be figured on a cash estimate and any sum which might be added to the balance after

the down payment as "differential" or "carrying charges" or "credit price" would not be construed as usury, even though greatly exceeding 10 per cent. And in the Hare case we said: "In a long line of cases, we have permitted the seller, under one guise or another, to do exactly what was done in the case at bar, and we have permitted the transferee of the paper to recover in just such a situation. Some of such cases are: *Garst* v. *General Contract Purchase Corp.,* 211 Ark. 526, 201 S. W. 2d 757; *Harper* v. *Futrell,* 204 Ark. 822, 164 S. W. 2d 995, 143 A. L. R. 235; *General Contract Purchase Corp.* v. *Holland,* 196 Ark. 675, 119 S. W. 2d 535; *Cheairs* v. *McDermott,* 175 Ark. 1126, 2 S. W. 2d 1111; *Standard* v. *Mitchell,* 173 Ark. 875, 298 S. W. 1026, 57 A. L. R. 877; and *Smith* v. *Kaufman,* 145 Ark. 548, 224 S. W. 978.

"In the case at bar, the parties dealt on the strength of the aforesaid holdings, which have become a rule of property, and we must not overrule these cases retroactively. Therefore, insofar as the case at bar is concerned, it must be affirmed on the strength of our previous holdings."

The Hare case then gave a *Caveat* to the effect that such cases as *Cheairs* v. *McDermott* could no longer be relied on as to the amount which could be added as "differential," "carrying charges," or "credit price" to the cash price and not be considered usurious.

We have been urged to recall the *Caveat* in the Hare case, but decline to do so; however, the case at bar must be affirmed on the usury issue because the contract was made prior to the date the Hare case became final.

Appellant also urges for reversal that the Court erred in overruling a motion for continuance made on the day the case was to be tried. Such motions to a large extent rest within the discretion of the trial court, and the record here is not such that we can say there was an abuse of discretion.

Appellant also contends that the court erred in overruling a motion made on the date of the trial to require the defendant to produce certain records; but appellant

could have obtained any records desired by making the motion at an earlier date or by subpoena *duces tecum* issued prior to the date of trial.

Crisco's testimony that the agreement was he would receive a $900 credit on the car he traded in instead of $855 as shown on the face of the contract was not admissible. The evidence is not sufficient to show fraud, and ordinarily parol evidence is not admissible to vary the terms of a written contract, *Outcault Advertising Co.* v. *Bradley,* 105 Ark. 50, 150 S. W. 148; *Firestone Tire & Rubber Co.* v. *Webb,* 207 Ark. 820, 182 S. W. 2d 941; but there is an exception when such testimony is for the purpose of showing a usurious contract, *Tillar* v. *Cleveland,* 47 Ark. 287, 1 S. W. 516; *Prickett* v. *Williams,* 110 Ark. 632, 161 S. W. 1023. However, here the Chancellor's holding that there was no usury is affirmed; therefore the testimony as to the claimed credit of $900 instead of $855 cannot be considered as it is at variance with the written contract; the trial court therefore erred in allowing the $45 credit.

Affirmed on appeal, reversed on cross-appeal.

Mr. Justice WARD concurs.

## ON REHEARING

GEORGE ROSE SMITH, J., on rehearing. In this case and in the allied cases that were decided on May 11 and May 25, 1953, the losing parties insist in petitions for rehearing that they have been deprived of their property without due process of law and have been denied the equal protection of the laws, in violation of the Fourteenth Amendment to the federal constitution. Ordinarily we do not consider questions raised for the first time on rehearing, but in fairness to the public we think it better to set this issue at rest now than to permit our views to remain undisclosed until the same question can be raised in future litigation.

The argument now presented is based on the fact that we said in *Ford* v. *Hancock,* 36 Ark. 248, that if no *bona fide* credit sale is involved it is usurious to add more than ten per cent *per annum* to the cash price

merely because time is given for its payment. As we explained in the original opinion in the case at bar, *Ford v. Hancock* has never been expressly overruled; but in a long series of later decisions we allowed the emphasis to shift gradually from substance to form, and in doing so we finally reached a point at which a loan of money could lawfully be disguised as a credit sale.

In *Hare* v. *General Contract Purchase Corp.*, 220 Ark. 601, 249 S. W. 2d 973, we returned to the spirit of *Ford* v. *Hancock*. In the *Hare* case we had three possible courses of action: (*a*) We might simply have adhered to the intervening decisions that had imperceptibly chipped away the foundation on which *Ford* v. *Hancock* rested. Such a holding would have involved no constitutional issue, since adherence to precedent is a basic principle of the common law. (*b*) We might have retroactively overruled those intervening decisions, thereby invalidating countless contracts made in reliance upon our declarations of the law. Even though such retroactive judicial pronouncements are permitted by the constitution, *Tidal Oil Co.* v. *Flanagan*, 263 U. S. 444, 44 S. Ct. 197, 68 L. Ed. 382, they are manifestly contrary to a sense of fair play. We could not in good conscience inform merchants that their reliance upon our many decisions had been foolhardy, that they should have guarded against the possibility that agreements lawful when made might later be declared void.

We chose instead the third course—that of recognizing the validity of contracts made upon faith in our decisions; but at the same time we stated in detail the rules to be followed after the opinion became final. That course was so demonstrably fair to every one that it is difficult for us to comprehend how it can be thought to have been violative of the constitution. That same "novel stand," however, was taken by the losing party in *Great Northern R. Co.* v. *Sunburst O. & R. Co.*, 287 U. S. 358, 53 S. Ct. 145, 77 L. Ed. 360, and was there shown by Justice Cardozo to be wholly without merit. We can add nothing to his admirable discussion.

Rehearing denied.

WARD, Justice, concurring. I deem it appropriate to concur in this case chiefly for the purpose of commenting on the *caveat* contained in the case of *Hare* v. *General Contract Purchase Corporation*, 220 Ark. 601, 249 S. W. 2d 973, since the opinion indicates the *caveat* will be followed hereafter. By reference to the *Hare* case it will be found that the *caveat* is divided into three sections. I can see nothing wrong with section (1).

Section (2), in my judgment, contains dangerous implications. It is realized that this *caveat* was probably intended only as a general guide for future decisions, but at the same time its language is calculated to so disturb legitimate business practices as to justify pointing out inherent dangers before they are incorporated into the body of law by decisions of this Court.

For the sake of brevity section (2) will not be copied here, but will be referred to as it appears in the *Hare* case, *supra*.

The objections I wish to point out can be made plainer by use of a simple, imaginary case which, it is submitted, is typical of many actual cases that might arise, and which comes within the framework of this section of the *caveat*.

*The imaginary case.* A, a secondhand car dealer, sells B a used car for $500 and takes his note for that amount due in one year, with interest at 10% per annum from date. Evidencing the transaction is a bill of sale, signed by both A and B, showing the above facts. A then takes B's note to C, a person or company engaged in buying (or discounting) commercial paper, and sells him the note for $490 cash.

*What happens.* B reads the *caveat* in the *Hare* case and calls on his lawyer, L. Suit is filed by B to cancel his note for usury. At the trial there is no trouble proving that C had many times before discounted notes for A, and, of course, A was reasonably sure he would do so this time. If L has any trouble making this proof,

he can get material assistance from *caveat* section (3). B swears A had a cash price of $495 but boosted it up to $500 for credit. A cannot deny this. C cannot deny, of course, that he will make $10 more than 10% interest on B's note.

The trial judge, having read section (2) of the *caveat,* perceives there is only one question of fact to determine, and so holds to this effect, that A, at the time he sold the car to B increased his cash price with the reasonable assurance that he could discount the paper [B's note] to C, then finds for B.

The realization of just what the jury might do in the above hypothetical case is enough to give the handlers of commercial paper a nightmare. Not only could C get hurt but so might anyone who purchased B's note from C.

*The result.*

1. In effect the *caveat* overrules numerous decisions of this Court [several cited in the opinion in this case] that a seller can fix his own price for his merchandise, and that he can [safely?] fix one price for cash and a different price for credit.

2. In effect the *caveat* makes usury depend on acts subsequent to the execution of the note. It must be concluded from the wording of the *caveat* itself that B's note would never have become tainted with usury if: (1) A had kept the note; (2) A had sold the note to someone who was not "engaged in the business of purchasing" notes; or (3) A had no assurance in advance that C would discount B's note.

It is readily conceded that the intervention of some third party, on the theory of agency, might be so related to the payee as to indicate usury, but here C has done nothing more than let A know he is in the discounting business and was willing to handle his paper.

Surely no one doubts that the discounting of commercial paper is a legitimate occupation. In Vol. 55 Am. Jur. at page 344 it is stated:

"Bills and notes, like other property, may be bought and sold on such terms as may be agreed upon, and a discount at any rate," etc., citing a long list of authorities.

The apparent intent on the part of this Court to protect the public from usurious transactions is laudable, but it occurs to me that we should be very careful in our effort to act as guardian that we do not inadvertently endanger or unjustly impede the transaction of legitimate business, particularly in the important realm of the free and confident circulation of commercial paper.

It appears to me also that many of the perplexing problems which arise out of usury charges could be met by the simple expedient of this Court requiring that every questionable charge be itemized or treated as interest. As long as credit prevails people are going to buy, and, as I see it, the only practical protection this Court can give is to guard them from being deceived. So, when a person desires to buy a car or any other article of merchandise, if he consents to pay the credit price and also to pay for an insurance policy, etc., he could not expect to be relieved of his assumed obligation where no deceit or fraud is involved and he knows full well what he has agreed to pay for. To say that, under such a rule, the public would be imposed on by unconscionable dealers and finance companies, is to admit that competition in business is no longer effective to keep prices reasonable.

Under the application of the rule I have proposed the question of usury in any transaction would depend on the presence or absence of any kind of fraud or deception, and I would not object to a strict enforcement to protect the public. Under the *caveat,* however, certain specified acts which are legal *per se* can, by certain declared presumptions and relationships, culminate in usury. In answer to this it could be said that the *caveat* presupposes an element of deception. If so, let it be met on that basis as I have suggested. It appears to me, however, that the *caveat* attempts to deal with a decep-

tion it imputes to the dealer—a deception that exists only in the mind of the dealer and which cannot be reached by any practicable method yet devised by man.

My prediction is that the further we attempt to pursue the process of judicial determination suggested in the *caveat*, the more confused our opinions and the public will become.