PACIFIC FINANCE CORPORATION *v.* SLAYTON.

5-204                                      262 S. W. 2d 452

Opinion delivered December 7, 1953.

746

*Bailey & Warren* and *Bruce T. Bullion,* for appellant.

*T. O. Abbott,* for appellee.

GRIFFIN SMITH, Chief Justice. The question is whether a contract for the loan of money, admittedly usurious, was discharged by action of the parties when a new obligation was incurred by the borrower in circumstances claimed by the lender to have been wholly independent of the outstanding debt. The second note does not show upon its face (nor is such fact reflected by the contract) that the vice now complained of was brought forward.

As an aid in purchasing a used Plymouth car, Jack E. Slayton procured of appellant a loan of $675 February 15, 1952. Installment payments were $45 over a fifteen-month period. General Motors Acceptance Corporation was paid $478.19. Added to interest of $42.19 was $39 identified by the single word "charges"—the two items amounting to $81.19. Other deductions were: Fire and theft insurance, $8.75; group installment credit disability certificate, $33.75; insurance premium on car, $66.25; differential paid the borrower in cash, $6.87.[1]

---

[1] From these figures it will be seen that in order to procure $486.06 ($478.19 x $6.87) appellee obligated himself for $108.75 to pay insurance premiums, $42.19 in interest, and an unidentified "charge" of $39, —a total of $189.94.

We do not find it necessary to say whether Slayton was unduly persuaded to subscribe for insurance he now contends was in part forced upon him. The admission of counsel representing Pacific Finance that inclusion of the service charge of $39 constituted usury simplifies the issue to a determination of whether the chancellor erred in finding that the second loan for the same amount, made May 21, 1952, was a device intended to conceal the illegal contract heretofore referred to.[2]

Before bringing his action to cancel the second loan Slayton, according to his assertions, offered to pay the amount due, with interest at ten per cent. This was refused.

The answer admits that installments on the first loan were paid on the fifth of March and April, but alleges that default was made May 5th.

R. N. Hardy of Dallas, Texas—regional manager for Pacific Finance in the territory embracing Arkansas, Oklahoma, New Mexico, and Texas—testified that the first loan was in strict compliance with Act 203 of 1951 and his company had no reason to apprehend that service charges would render contracts usurious when the amount so exacted, with interest, brought the total above ten per cent per annum.

Hardy says he first talked with Slayton May 21. The manager's duty was to check accounts for delinquencies, get in touch with those who had failed to pay on time, and ascertain the cause of failure. The company did not bother if an obligation well secured showed default when explanations showed that the debtor was ill, out of work, or otherwise temporarily handicapped. The purpose in calling Slayton was to ascertain if the person who made the note still resided at the ad-

[2] Comparatively recent cases dealing with usury are *Strickler* v. *State Auto Finance Company*, 220 Ark. 565, 249 S. W. 2d 307; *Winston* v. *Personal Finance Company of Pine Bluff, Inc.*, 220 Ark. 580, 249 S. W. 2d 315. In the last two cases loans thought to have been made in compliance with Act 203 of 1951 were found to be usurious. [But see *Hare* v. *General Contract Purchase Corporation*, 220 Ark. 601, 249 S. W. 2d 973; *Crisco* v. *Murdock Acceptance Corporation*, 222 Ark. 127, 258 S. W. 2d 551.]

dress originally given. Hardy was positive that in "reviewing the slow book" he contacted Slayton—or, rather, in the normal course of business this would have been the procedure. Hardy's impression was that Slayton explained the delinquency by saying he was out on strike, was ill, or that work had stopped because of the steel shortage; "but," said the witness, "in my conversation with him (after the emergency had been explained) I pointed out that he was qualified for additional money from the company and suggested that if he needed it that he ought to see a banker, a lending company—or, if he preferred, we would be glad to consider a loan for him. He apparently chose us and came to the office three or four hours later."

Slayton testified that just before the second loan was made the finance company called him, saying it had a "new deal." In response he went to the company's office. Following explanatory conversations, the substance of which is in irreconcilable conflict, a new note was executed for $675. According to Hardy the first loan was not (to his knowledge) mentioned during Slayton's second visit to the office. After completing this transaction the check was handed to Slayton, who was informed that it would be cashed at the office if this should be his wish. Hardy thought the car was good security for a loan of from $1,100 to $1,500. The cashier was seemingly not advised "as to exactly what Mr. Slayton wanted to do, so when I got there he was attempting to pay off the other deal—which was perfectly satisfactory as far as we were concerned."

The second check was for $632.81—($675, less interest of $42.19). Hardy's calculations, taken at random from his testimony, would seemingly produce this result: The first note for $675 included interest of $42.19 (as did the second), but $90 had been paid, so the overall sum had been cut to $585. There was an interest rebate of $31.98, thus reducing the debt to $553.02. From proceeds of the check for $632.81 Slayton paid this item and kept $79.79. The Chancellor, therefore, was correct

in finding that credit had not been given for the usurious charge of $39.

The trial court was not willing to believe Hardy's version of the transaction, which would include these inconsistent statements: At a time when Slayton was financially deficient because of a strike, steel shortage, or unemployment, and could not meet an obligation of $45 per month, he wholeheartedly (and without reference to the existing debt) obligated himself for an additional $45, there having been no suggestion that the outstanding note would be retired. But on an impulse, as he passed the office of appellant's cashier, the check was cashed, the old debt was paid, and Slayton walked out with nearly $80 of new money.

A Chancellor is not required to believe incredulous testimony where its acceptance sets a pattern varying from what intelligent men ordinarily do or fail to do in similar circumstances. Here the appellant's explanations were not persuasive, and our conclusions touching motives are substantially the same.

Slayton insists there was no surrender of the first mortgage or reissue of insurance policies. It is not inconceivable that a man in financial need to such an extent that monthly payments of $45 could not be met would bind himself for double that amount in order to have the use of ready cash; but in the circumstances here the facts are so decidedly opposed to appellant's explanations that the decretal order must remain intact.

Affirmed.