PUBLIC LOAN CORPORATION *v.* WEAVER.

5-420                                           270 S. W. 2d 888

Opinion delivered June 28, 1954.

[Rehearing denied October 4, 1954.]

*Wright, Harrison, Lindsey & Upton,* for appellant.
*Digby & Tanner,* for appellee.

GRIFFIN SMITH, Chief Justice. Public Loan Corporation of Little Rock, and Public Loan Corporation, Monroe, La., have appealed from decrees declaring certain contracts void because of usury.[1]

The Weavers, husband and wife, borrowed from Public Loan Corporation of Little Rock February 6, 1952. The application was by Mrs. Weaver, who testified that she did not inform her husband that the obligation had been incurred until complications arose, and she signed the notes for herself and her husband, executing a mortgage on personal property, including household goods.

Two Arkansas corporations were chartered under Act 203 of 1951, commonly known as the Small Loans Act, approved Feb. 28 of that year. The Weaver note was for $990, payable in equal installments of $55 over a period of eighteen months. Deductions were: Discount, $74.25; service charge, $45.60; life insurance premium, $29.70; health and accident insurance premium, $29.70. The total of these items is $179.25, leaving $810.75 for the borrowers. Momentarily disregarding the insurance charges, it will be seen that discount and service charges were $119.85. Treating the discount and service charges as interest the result would be an exaction of $119.85 for the use of $870.15. But the "use" was on a plan requiring the principal to be diminished at the rate of $55 per month, hence the actual interest rate without reference to insurance charges was substantially above ten per cent.

On May 19, 1952, in a suit brought by Mrs. Lovie Strickler against State Auto Finance Company, this court held that a service charge such as the one we now consider could not be authorized by the General Assembly in derogation of the constitutional provision against usury, and to the extent that such charges exceeded a ten per cent interest rate Act 203 of 1951 was no protection.

---

[1] Three corporations feature in the proceedings. Public Loan Corporation (without further identification) was chartered March 9, 1951. Public Loan Corporation of Little Rock was chartered April 3, 1951. The third entity is the Monroe (La.) corporation, organized under the laws of Ohio, with a permit to do business in Louisiana. [Although Little Rock is mentioned throughout the opinion, the business office was in North Little Rock.]

Twelve days after this court rendered its opinion on the validity of Act 203 Mrs. Weaver was asked by J. C. Evans, manager for Public Loan of Little Rock, if she needed more money. Upon receiving an affirmative reply three transactions were consummated. The balance of $825 remaining after three $55 payments had been made was disregarded and two new notes were executed: One was for $500 payable to Public Loan of Little Rock, with interest at ten per cent. The other was for $300 payable to Public Loan Corporation, Monroe, La., for $300. This note bore interest at 3½% per month on $150, and 2½% per month on $150. It was payable over a period of eighteen months in equal installments of $22.25. Mrs. Weaver was given rebates on the original $990 note as follow: Discount, $45.58; service charge, $33.08; life insurance premium, $23.17; health and accident premium, $23.17—total, $125.00.

In closing this transaction Public Loan Corporation [of Little Rock] handled all matters incidental to execution of the two notes and transmission of the $300 item to the Monroe corporation. There is testimony that the mortgage and notes and the payment of $100 to Mrs. Weaver were completed the same day, or at least not later than the day following the agreement. The Little Rock agency contends that the Louisiana note was sent to Monroe and that it received from Monroe a check that was applied on the Weaver obligation—that is, it was applied as a credit after the rebates had been entered. This left the Weavers owing the Little Rock corporation $500 and (presumptively) the Monroe branch $300. We say "presumptively" because L. M. Curtiss, an officer of the Monroe Corporation, testified that the stock of his corporation and the Little Rock organization was owned by American Investment Company of Illinois.

It was shown that the Monroe corporation was not authorized to do business in Arkansas. See Ark. Stat's, § 64-1202. The Weaver application, addressed to the Monroe agency, contains this statement: "Subject to acceptance by you in Monroe, La.; I hereby make application by mail for a loan of $300 and enclose my note and

mortgage for same, which loan is to be made under the Louisiana Small Loan Law.''

The Chancellor found that the renewals were a part of a scheme or plan to circumvent the Arkansas decision; that the borrowers were uninformed respecting their rights; that substantial acts connected with the so-called Louisiana loan were consummated in Little Rock, and that the taint of usury attached to the renewals.

We agree with the trial court that Public Loan of Monroe was doing business in this state. There is no evidence that its officers had ever seen the mortgage or that they knew what the security was. The time element was such that decisions must have been made in Little Rock.

We do not find it necessary to pass upon the insurance contracts, since without them the $990 contract was usurious. Manager Evans testified that he was an unpaid agent of the Old Republic Credit Life Insurance Company. He voluntarily gave his services. Evans was paid a salary by the Little Rock loan corporation. All Public Loan Corporations, he said, are controlled by American Investment Company, with headquarters at Springfield, Ill. During the period Evans was manager in Little Rock ''. . . they always filled out papers that the Monroe office needed to complete a loan and let the person applying for the loan authorize the disbursement. No collections were made from the office in North Little Rock until they became delinquent, *and we would handle that transaction the same as any other capital. We would collect for them* with no charge . . .''

This testimony was given by Evans regarding the Weaver loan: ''I gave [Mrs. Weaver] eighteen months on payment in Louisiana, at $22.25 per month, so she filled out the routine application—which is a Monroe application—and signed another application here which authorized us—rather the Monroe company—to make payment to us for $300 on the old loan, so we could clear it out with a $500 loan she was to get. . . . I gave her $125 off her old loan so she could get the extra hundred

dollars and keep the payments roughly the same as they were. We agreed to that, [but] the papers were drawn up on the Monroe, Louisiana, forms. . . ."

At another point in his testimony Evans said: ". . . No, sir; I told you I arranged it, but I didn't make the loan. The loan was made in Louisiana."

On September 9th, 1952, Evans, using stationery of the Little Rock office—wrote to Mrs. Weaver that her account was delinquent and that $22.25 had to be paid immediately: "Please phone me as soon as you receive this letter. If you cannot pay your account to date, I may be able to make arrangements for you, but if you fail to get in touch with me *it may be necessary for me to demand payment* of the entire unpaid balance." Following the signature this notation appears: "Monroe loan: This payment payable in North Little Rock office immediately."

Evans explained that this letter was sent out through mistake, but a little later he was asked whether (after forwarding applications to Monroe) the Little Rock office had anything further to do with the loan, and he replied: "Only when it became delinquent. As I stated, any time an account became delinquent—whether New York City, San Diego, or where—we give it prompt service. We give that to our Monroe office on delinquent accounts only."

In the Weaver case Evans did not contact the Monroe office "before the matter was closed . . . In order to maintain somewhat of a profitable operation we would endeavor to get people additional money—purely from a selfish standpoint, so they would not get mad and sue us."

Neal Taylor, a representative of the Little Rock Corporation, testified that money would not be loaned to customers unless they would execute a Louisiana loan. He did not know whether any security was taken in Mrs. Weaver's case, apportionable to the Monroe office.

Charles Hulteen, who stated that he was manager of the "branch office" in North Little Rock, testified that his instructions were to help an applicant who wanted more money. ". . . We would merely recommend them to the Louisiana office . . . We handled their signatures and the papers were sent down to be notarized, but the loan was not approved in our office."

Whether the Louisiana agency actually intended to do business in Arkansas is not the controlling issue. Preponderating evidence is that its business was being handled by the Little Rock office, and the three loans are so inextricably linked that the usurious nature of the original contract extends to all. *Pacific Finance Corp.* v. *Slayton*, 222 Ark. 745, 262 S. W. 2d 452. We are unable to see that interstate commerce is involved in the $300 loan when the people who were owners of each branch were rendering reciprocal services and extending essential accommodations. In this holding we do not impair such cases as *Mechanics Lumber Company* v. *Yates American Machinery Co.*, 181 Ark. 415, 26 S. W. 2d 80; *Peebles* v. *Columbian Woodman*, 111 Ark. 435, 164 S. W. 296; *Kelly* v. *Telle*, 66 Ark. 464, 51 S. W. 633, and *Beauchamp* v. *Bertig*, 90 Ark. 351, 119 S. W. 75, 23 L.R.A. (N.S.) 659, and like cases cited by the appellant.

Affirmed.