HARRIS *v.* McCANN.

5-1695                                          319 S. W. 2d 832

Opinion delivered January 19, 1959.

*Shaver & Shaver; Davis & Davis, Memphis, Tenn.,* for appellant.

*Catlett & Henderson & David Solomon, Jr.,* for appellee.

SAM ROBINSON, Associate Justice. Appellant, R. E. Harris, as agent for his wife, Sadie Harris, contracted to sell a large plantation to appellee, A. I. McCann. Later, a portion of the place, 640 acres, was sold to Harlen Wilson and wife for the price of $66,000, of which $10,000 was paid in cash and notes given for the balance of $56,000. Harris loaned money to McCann to operate the plantation for the years 1955 and 1956. In

January, 1957, McCann filed this suit, asking for specific performance of the contract of sale. McCann made an alleged tender of the amount he claims he owed. He contends, however, that he should have credit for $66,-000, the price of that part of the land sold to Wilson. Harris answered and set up several defenses. He denied that McCann should have credit for the sales price of the Wilson land. He alleged that McCann had breached the contract by failing to make payments in accordance with the terms thereof; that there had been a forfeiture; and, further, that by mutual agreement the sales contract had been rescinded. By way of cross complaint Harris asked for judgment for the alleged unpaid balance on money loaned to McCann to make the crops. McCann answered the cross complaint, alleging that Harris had charged a usurious rate of interest for the money loaned to make both the 1955 and 1956 crops. Later, Harris filed a new suit against Florida Real Estate Loan Company, Helena National Bank, A. I. and Grace E. McCann, and B. A. and Mary Lucille McCann, alleging that the defendants had wrongfully encumbered the title to the property, and asked that the title be cleared and that the plaintiff be given judgment for damages. The cases were consolidated.

Upon a trial of the issues, the chancellor ordered specific performance of the contract, and it was the decree of the court that a usurious rate of interest had been charged by Harris on loans for both of the years 1955 and 1956, but that McCann could not recover that part of the 1955 account which had been voluntarily paid; that the 1956 loan was void because of usury and that there is no merit to Harris' claim that title to the property has been wrongfully encumbered; and, further, that McCann should have credit for the price of the land sold to Wilson. Harris has appealed. And McCann has cross-appealed from that part of the decree disallowing recovery of the payments made on the 1955 account.

On the 20th day of December, 1954, Harris and his wife entered into the contract whereby they agreed to

sell, and McCann agreed to buy, Wildwood Plantation in Phillips County, consisting of approximately 2,915 acres, and also the farming implements, *etc.*, used in operating the place. On January 1, 1955, the property was turned over to McCann. On March 2, 1955, a more formal contract of sale was executed. The purchase price, including land and equipment, was $300,000, of which $8,000 was paid in cash, and in addition McCann and his wife gave their note for $12,000 due December 1, 1956, secured by a mortgage on other property. The balance of the purchase price of $280,000 was to be paid in twenty yearly installments of $14,000 each, and interest, the first installment becoming due on or before December 20, 1955. Harris loaned McCann the necessary money to operate the place for the years 1955 and 1956. In January, 1956, the 640 acres was sold to Harlen Wilson and wife for the sum of $66,000; Wilson paid $10,-000 in cash and executed notes payable to both McCann and Harris for the balance. The $10,000 in cash was paid to Harris, and McCann endorsed the notes and turned them over to Harris.

On the 10th day of January, 1956, Harris furnished McCann a statement showing that he had advanced to McCann $83,952.43, and that McCann was entitled to credits for $65,565.74, leaving a balance owed by McCann to Harris of $18,386.69. Two days later, on January 12th, additional charges and credits were made that grew out of the 1955 operation of the place, and on that day Harris furnished McCann a statement showing there was a balance of $11,635.04 owed by McCann from 1955 (this amount was carried forward into the 1956 account). The statement for 1955 included an item dated January 9th, as follows: "Interest on furnish account, $2,677.40." On the face of this statement is written, in longhand, "This settlement is hereby accepted as a true and final settlement of account. Signed R. E. Harris A. I. McCann." In addition, Harris had received and credited to the debt on the land $14,000 principal and about the same amount as interest.

Mr. John A. Moye, Jr., is vice-president of Helena National Bank and has computed all types of interest over a period of 17 years. He testified that the interest charged by Harris to McCann on the "furnish" account for the year 1955 exceeded 10% per annum by $525.05. The parties had contracted for an interest charge of 6%. All of the charges and credits are taken from the books of appellant Harris. The computation of interest made by Mr. Moye is based on the records of Mr. Harris, and it appears from a preponderance of the evidence that more than 10% interest was charged for the year 1955.

McCann contends that with the exception of two comparatively small checks for wheat and oats which he turned over to Harris, all the receipts for the crops produced were paid to Harris by the purchasers of such crops, and therefore such receipts cannot be considered as voluntary payments on his indebtedness to Harris. But McCann accepted the statement of January 12th as a "true and final settlement of account". If he did not actually authorize the application to the "furnish" account of the funds received by Harris from the crops, he certainly ratified such application, which is the same as having authorized it in the first instance.

But the situation is different for the year 1956. In that year Harris furnished to McCann $45,159.49, which includes the $11,635.04 carry-over from 1955. McCann owed Harris two separate accounts, one for the "furnish" and one for the land. Harris had received $40,-949.48 from the sale of crops produced on the property in 1956, but none of this money had been applied to any particular account. It had been held by Harris as unallocated. It had not been applied to either the land or the "furnish" account. Furthermore, the parties had reached no agreement as to the allocation of the receipts. Sometime during the latter part of October (the exact date is not shown on Harris' statement) he charged McCann with a "carrying charge" of $2,290.65. According to Mr. Moye, the expert on computing interest, this carrying charge exceeds 10% per annum on

the money loaned to McCann by Harris during 1956. The chancellor held that such carrying charge was usurious and therefore Harris had forfeited the money loaned to McCann in 1956 and the interest thereon.

On the question of usury Harris contends that the carrying charge does not exceed 10%; that whatever money he received from McCann was paid voluntarily; that the transaction is not usurious because there was no agreement between the parties for the charge of interest at a rate of more than 10% per annum. In the first place, the dates of advances of money to McCann and the amounts thereof are all shown on Harris' books, as well as the interest charged, which is designated "carrying charge". The preponderance of the evidence shows that the "carrying charge" amounts to more than 10% per annum on the amounts advanced. Mr. Harris attempts to explain that items other than interest are included in the "carrying charge". But his testimony in that respect is not convincing. In the recent case of *Jones* v. *Jones*, 227 Ark. 836, 301 S. W. 2d 737, we said: "When, as here, the lender writes the contract he has the opportunity to put down in black and white an intelligible description, and the exact amount, of every charge that is being added to the principal of the debt. Last week we pointed out that the practice of attaching meaningless labels to such charges weakens the lender's position when usury is asserted. *Whiddon* v. *Universal C. I. T. Credit Corp.*, 227 Ark. 824, 301 S. W. 2d 737. The same criticism can fairly be made of a contract that gives the borrower no information at all about the deferred charges being exacted by the lender. In either case the trier of the facts is justified in assuming, until he is convinced by proof to the contrary, that the difference between the principal of the loan and the face amount of the contract represents interest on the debt."

McCann actually in person had not paid anything to Harris in 1956. True, those who had purchased the crops produced by McCann had, by agreement of the parties, paid the purchase price to Harris. But, as here-

tofore pointed out, McCann owed Harris a debt on the purchase price of land and owed the ''furnish'' account, and the money received by Harris from the 1956 crop to apply on McCann's debts had been held in an unallocated account and had not been applied to either the land account or the ''furnish'' account. In these circumstances it cannot be said that there had been a voluntary payment on the 1956 ''furnish'' account.

Next, Harris says that since there had been no agreement by McCann to pay more than 10% per annum interest, the fact that more than that amount may have been charged does not make the transaction usurious, and cites, among other cases, *Sloan* v. *Sears, Roebuck and Co.*, 228 Ark. 464, 308 S. W. 2d 802, and *General Contract Corp.* v. *Duke*, 223 Ark. 938, 270 S. W. 2d 918, to the effect that the transaction is to be judged as of the time the contract is made and not thereafter. Appellant therefore contends that since the contract provides for only 6% per annum there can be no usury for the simple reason that the borrower has to pay only what the contract calls for.

The carry-over from 1955 of $11,635.04 embodied part of the usurious interest charged in 1955. Furthermore, to constitute usury there must be only the intention of the lender to take or receive an unlawful rate of interest. *Baxter* v. *Jackson*, 193 Ark. 996, 104 S. W. 2d 202; *Wilson* v. *Whitworth*, 197 Ark. 675, 125 S. W. 2d 112. Undoubtedly it was Harris' intention from the beginning to compute the interest by charging a straight 6% on all sums advanced, regardless of the date he actually parted with the money. For both years, 1955 and 1956, the amount of the ''carrying charge'' is a flat 6% of the total advanced. This is exactly the method used in computing interest in *Brooks* v. *Burgess*, 228 Ark. 150, 306 S. W. 2d 104, and was held to be usurious, the amount of the interest exceeding 10% per annum, as in the case at bar.

McCann contends that he should have credit on the land account for $66,000, the sales price of the land bought by Wilson. Harris maintains that McCann is

not entitled to credit for the sales price of the Wilson land. The sale to Wilson came about in this manner: Mr. Godfrey Merrifield is a real estate broker. He had been authorized by Harris to sell Wildwood Plantation. It was agreeable with Harris to divide the place and sell it in parcels to different buyers, provided all parcels were sold, but Merrifield negotiated a contract between Harris and McCann whereby McCann agreed to buy the whole place. This contract provides: "15. It is further mutually agreed between the parties that the purchaser may sell any portion of the approximately 2,915 acres of land hereinabove described at any time during the life of this contract, provided that the price and terms are agreeable to the sellers and the proceeds from such sales are applied to the indebtedness owing to the sellers by the purchaser as hereinabove set out."

Later, after the contract had been made between Harris and McCann, Merrifield found Wilson as a purchaser of a portion of the place, known as Section 28, consisting of 640 acres. The contract to sell the property to Wilson was signed by McCann and his wife and Harris and his wife, and, of course, by Wilson. Wilson paid $10,000 in cash, which was turned over to Harris, gave his notes, payable to both Harris and McCann, for $56,000, the balance of the purchase price, payable in annual installments. The notes were endorsed by McCann and delivered to Harris. When the first installment became due, Wilson made the payment to Harris. The contract between Harris and McCann is somewhat ambiguous, in that it does not specifically provide whether the notes taken in connection with the purchase price should be regarded as proceeds from the sale. (It will be recalled that the contract between Harris and McCann provides that the proceeds from the sale of any part of the property to a third party should be applied to McCann's indebtedness to Harris.) Appellant Harris contends that the notes should not be regarded as part of the "proceeds" as mentioned in the Harris-McCann contract and therefore should not be applied to the indebtedness owed by McCann. On the other hand,

McCann says that when all the facts and circumstances are considered, the Wilson notes should be regarded as part of the proceeds from the sale of the Wilson land and the full amount of these notes applied to McCann's indebtedness to Harris. Both sides cite numerous cases to sustain their point as to what should be considered "proceeds" of a sale in circumstances of this kind. But we think the case at bar is more closely in point with *Rose* v. *Hall,* 171 Ark. 529, 284 S. W. 776. There the Court said: "We think what was intended and the thing which was in fact done was to substitute, by consent of all parties concerned, Sarah Hall as the purchaser from Rose, instead of from Shuptrine." And that appears to be what was done in the case at bar. Wilson was substituted for McCann as the purchaser of the 640 acres. Every detail of the sale to Wilson was approved by Harris, and everything received from the sale, including the cash and the notes, was turned over to Harris. In the first place, from the very beginning Harris contemplated selling the plantation in parcels, and although he contracted to sell the entire property to McCann, the contract provided that McCann could sell any portion of the property "provided that the price and terms are agreeable to the sellers (Harris) and the proceeds from such sales are applied to the indebtedness" owned by McCann to Harris. It will be noticed that all the terms of the sale had to meet the approval of Harris, including the selling price; hence, Harris could insist on a selling price, a down payment, and deferred payments, that would give him full protection in the event of a sale. And certainly, when Wilson finally would have paid in full for the land he would have title to it free of any indebtedness that McCann might still owe to Harris. Furthermore, the entire transaction was handled by Harris as if he were selling the property to Wilson; Harris' real estate broker arranged the sale; his lawyer drew up the contract of sale on terms dictated by Harris; the proceeds of the sale — the $10,000 cash payment and the Wilson notes—were delivered to Harris; Harris kept a complete double entry set of books, and the record of the sale to Wilson was set up on Harris'

books just like the sale to McCann had been set up; Wilson was given credit for the $10,000 down payment; McCann's land account was not credited with the down payment; neither was the McCann account credited with the first installment payment made by Wilson. We think a preponderance of the evidence shows clearly that all the parties considered that Wilson was substituted for McCann as a purchaser of the 640 acres which we have spoken of as the Wilson land.

Appellant makes the further contention that the contract of sale between Harris and McCann was rescinded by mutual agreement. This is a question of fact, and there is ample evidence to sustain the chancellor in the finding that the contract was not rescinded. True, a rescission of the contract was discussed, but McCann says he did not agree to the rescission, and the conduct of the parties subsequent to the time Harris contends the contract was rescinded does not appear to sustain Harris' contention. McCann remained in possession of the property; he paid to Harris $12,000, which was part of the agreed down payment. Moreover, the notes given by McCann in connection with the $300,000 purchase price were not returned to him.

Appellant makes the further argument that McCann should not prevail because he did not come into court with clean hands, but we do not think the acts Harris alleges that McCann has committed bring the case within the clean hands doctrine.

In order to raise the money to pay Harris in full, McCann mortgaged the property to Florida Real Estate Loan Company. It is appellant's contention that both McCann and Florida are liable for unlawfully encumbering the title to the property. McCann had possession of the property and had paid part of the purchase price; he had an equitable interest which he had a right to mortgage. 41 C. J. 374; 36 Am. Jur. 708; *Oliphint v. Eckerley,* 36 Ark. 69.

Appellant further maintains that McCann has made no valid tender of the purchase price. It appears that

when McCann attempted to pay the debt and demanded a deed, the principal issue between the parties was whether he should be given credit for the price of the land sold to Wilson, and since it is being held that he should be given such credit, there is no doubt about the tender being sufficient. But the tender was not sufficient to stop the running of interest on the debt. Florida Real Estate Loan Company had agreed to loan McCann $187,500, and the Mississippi County Bank had agreed to loan $12,500. This money was to be used to pay off the debt McCann owed Harris. Although the money was available and could be obtained at any time for the purpose of paying off the debt, it had not actually been advanced by Florida or the Bank, and Florida was not willing to deposit the money in court. There is no indication that McCann would have to pay interest on the money until such time as it was actually advanced. In these circumstances it would be inequitable to say that the tender stopped the interest on the debt to Harris, because if that were done McCann would be having the full use and benefit of the money owed to Harris without the payment of interest to anyone. Of course, McCann did not propose to use his own money to pay off the debt, and Florida and the Bank have not actually advanced the money, but have agreed to make it available to McCann for the purpose of paying off the loan when that can be done.

In 55 Am. Jur. 779, it is said: "A tender alone however, does not keep a purchaser in possession from being liable in equity for interest; he must keep the tender good and set aside the money for the vendor's use, as by a deposit in a bank or in court. There is also authority to the effect that a vendee in possession must give notice that the money is set aside for the vendor's use in order to escape being liable in equity for interest. . . . An arrangement between a contract purchaser of real property of which he has taken possession, and a bank, that the bank will furnish the money to be paid on the contract when needed, upon security of bonds deposited with it, is not such a setting aside and appropriation of money to the contract as to exonerate the

purchaser from liability in equity for interest in case of delay in carrying out the contract.''

We think that in the circumstances of this case principles of equity demand that the debt owed by McCann to Harris bear interest until the debt is paid, and the decree should be modified to that extent.

On cross-appeal McCann contends that Harris charged him a usurious rate of interest on the ''furnish'' account for the year 1955, and that he therefore should have credit for the amount he paid on the 1955 account. The parties had a settlement on the 1955 account, and a statement of account prepared by Harris showed McCann owed a balance of $11,635.04. This amount was carried into the 1956 account and has been held void because of a usurious rate of interest charged on the account for that year. The parties considered that all of the 1955 account except the $11,635.04 had been paid in full. Appearing on the 1955 statement of account is the following: ''This settlement is hereby accepted as a true and final settlement of accounts. Signed: R. E. Harris A. I. McCann.''

There can be no recovery of money voluntarily paid on an account, where a usurious rate of interest was charged, except a recovery of the excessive interest. *Anderson* v. *Shoup*, 180 Ark. 955, 23 S. W. 2d 616. Even though the borrower may ordinarily recover the excessive interest, there is no showing here of what portion of such interest is embodied in the $11,635.04 carried into the 1956 account and declared void.

Appellee further contends on cross-appeal that he should have credit for $5,134.70 profit which he claims Harris wrongfully made out of crops raised by McCann and for a compress rebate of $94.50. These are questions of fact, and it would unduly extend this opinion, which is already too long, to set out in detail the ramifications of those issues. Suffice it to say we have examined the record and carefully considered argument of counsel, and we cannot say the chancellor's finding

against appellee in that respect is against a preponderance of the evidence.

Affirmed as modified on appeal; affirmed on cross-appeal.