**L. M. McADOO et al., Appellants,**

v.

**UNION NATIONAL BANK OF LITTLE ROCK, ARKANSAS, Appellee.**

No. 75–1700.

United States Court of Appeals, Eighth Circuit.

Submitted April 15, 1976.

Decided May 21, 1976.

---

**1052**

Edward R. Smith, Lubbock, Tex., for appellants; Dean Carlton, Dallas, Tex., on brief.

Lucius Bunton, Odessa, Tex., for appellee; Griffin Smith, Little Rock, Ark., on brief.

Before GIBSON, Chief Judge, ROSS and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

L. M. McAdoo and Vanita M. Byars, Executrix of the Estate of Clarence C. Byars, deceased, plaintiffs below, joined by Great Oil Basin Securities Corporation, a nominal defendant, appeal from a judgment of the United States District Court for the Eastern District of Arkansas [1] rendered in February, 1975 in favor of one of the defendants, Union National Bank of Little Rock, Arkansas.

In 1970 McAdoo and the late Clarence C. Byars were minority stockholders in Great Oil Basin, a Texas corporation with its principal place of business in Odessa, Ector County, Texas. They commenced this suit in federal court in the Northern District of Texas as a stockholders' derivative action against the corporation, as nominal defendant, and against a number of actual defendants, including Ivan A. Ezrine and Maurice F. Olen. Basically, plaintiffs alleged securities fraud, conspiracy, and a plundering of the company by Ezrine, Olen, and others. Subject matter jurisdiction, which is established, was based on the Securities and Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*

Union National Bank of Little Rock, Arkansas, hereinafter called the Bank, was brought into the case as a defendant while the litigation was pending in federal court in Texas. After a number of proceedings had been had in the Texas court, the case was transferred to the Eastern District of Arkansas in January, 1972 pursuant to 28 U.S.C. § 1404(a).

As far as the Bank was concerned, plaintiffs sought a declaratory judgment invalidating a promissory note in favor of the Bank executed on behalf of Great Oil Basin on August 26, 1969 and payable on or before August 26, 1970. The note evidenced a loan of $500,000.00 made to the corporation by the Bank; the note bore interest at the rate of 9% per annum from date until paid, and was secured by a deed of trust covering a shopping center in Odessa, Texas, which was the principal asset of the borrower. The note and deed of trust were signed by Ezrine as ostensible president of the corporation and by the corporation's secretary, Joan Wellner. The borrowing of the money and the execution of the loan papers were

---

1. The Honorable Paul Benson, Chief Judge, United States District Court for the District of North Dakota, sitting by designation.

purportedly authorized by a resolution of the Board of Directors of Great Oil Basin.

Great Oil Basin was not a regular customer of the Bank and its principal place of business was located hundreds of miles from Little Rock. In the summer of 1969 money was extremely tight, and the Bank was not in a financial position to make a $500,000.00 loan to Great Oil Basin without compensating funds. After negotiations that went on over a period of months prior to the .making of the loan, the parties agreed that the borrower would furnish the Bank with a certificate of deposit (CD) in the amount of $300,000.00, maturing in one year, and it was agreed that this certificate would bear interest at the rate of 6.25% per annum to be paid by the Bank.

The borrower obtained the CD from a broker in Philadelphia, Pennsylvania, and paid the broker a fee of $9750.00 for use of the certificate. Presumably, the CD was issued in the name of the brokerage company or its principal or principals; while it was ultimately delivered to the Bank and increased the cash funds or reserves of the Bank by $300,000.00, it was not held by the Bank as collateral security.

Great Oil Basin defaulted on the note when it fell due, which was shortly after this suit had been commenced in Texas. However, during the pendency of the case very substantial payments have been made on the note and have been duly credited to the borrower. Those payments were without prejudice to the legal position assumed by plaintiffs and Great Oil Basin in this action.

The position of plaintiffs in the district court was that Ezrine had no authority to bind Great Oil Basin with respect to the loan, and that the loan was usurious as a matter of Arkansas law in that when the net value of the CD to the Bank is taken into consideration, the effective interest

called for by the obligation was in excess of 10% per annum which is the maximum legal rate of interest that may be charged in Arkansas in view of Article 19, § 13 of the Arkansas Constitution of 1874; *see also* Ark.Stat.Ann. §§ 68–608 and 68–609.[2]

The Bank denied that plaintiffs were entitled to the relief sought, but the Bank sought no affirmative relief for itself until several months after the judgment of the district court was rendered.

The case was tried to the court and a jury. Plaintiffs' case consisted of a number of depositions, including those of Ezrine and Olen, which were read to the jury, and a number of documentary exhibits. At the conclusion of plaintiffs' case, counsel for the Bank moved for a directed verdict or for the entry of a judgment in favor of the Bank. That motion was denied. The Bank then offered certain depositions and documents and called as witnesses David L. Jameson who was Assistant Cashier of the Bank when the loan was made and Don Couch who was President of the Bank at that time. Neither Mr. Jameson nor Mr. Couch was connected within the Bank at the time of the trial.

At the conclusion of all of the evidence, plaintiffs moved for a directed verdict or for entry of judgment in their favor, and the Bank renewed its motion made at the close of plaintiffs' case.

The motions were denied. The issues of usury and authority were submitted to the jury on special interrogatories and instructions in connection therewith as authorized by Fed.R.Civ.P. 49(a). The jury found that the loan was not usurious, and also found that Ezrine had real or apparent authority to bind Great Oil Basin in connection with the loan.

The district court accepted the findings of the jury. On February 27, 1975 the district court made certain findings of fact

2.  Under the provisions of 12 U.S.C. § 85, as it was written in 1969, the maximum rate of interest that a national bank operating in Arkansas could lawfully charge was basically that prescribed by Arkansas law. 12 U.S.C. § 86 provides that if a national bank charges excessive interest, it forfeits all interest on the obligation; if excessive interest has in fact been paid, the borrower or his legal representative may recover from the bank twice the amount of the interest paid.

and entered judgment favorable to the Bank.

Plaintiffs moved for judgment notwithstanding the jury's answers to the interrogatories, or, alternatively, for a new trial. That motion was filed in early March, 1975 and seems to have been taken under advisement by the district court; it was ruled upon in late July, 1975.

While that motion was pending, the Bank filed a "Countermotion to Modify Judgment," in which motion it prayed that the judgment be expanded so as to call for a judicial foreclosure of the Bank's lien on the shopping center. Plaintiffs promptly filed an "Opposition" to the countermotion and a brief in support of the opposition.

On July 28, 1975 the district court filed a memorandum opinion discussing the questions of usury and authority and denied plaintiffs' post-trial motion. This appeal followed.[3] The record does not indicate that the district court has ever ruled formally on the Bank's "Countermotion" and the plaintiffs'" "Opposition" thereto.[4]

For reversal, plaintiffs contend: (1) that the evidence established as a matter of law that the Bank's loan was usurious by reason of the alleged collateral benefit that the Bank gained from the certificate of deposit, and that the district court erred in submitting the question of usury to the jury; (2) that the burden was on the Bank to show by a preponderance of the evidence that Ezrine had real or apparent authority to bind Great Oil Basin in connection with the loan; that on that issue the Bank did not make a submissible case, and that the district court erred in submitting the issue of authority to the jury; and (3) that the findings, conclusions and judgment of the district court impermissibly went beyond the pleadings in the case and were inconsistent with the position of the Bank that it was seeking no affirmative relief in the action.

In passing upon the first two contentions we are required to view the evidence in the light most favorable to the Bank, to give the Bank the benefit of all inferences favorable to it which reasonably may be drawn from the evidence, and to uphold the district court and the findings of the jury unless the evidence was so one-sided that reasonable men could not differ as to how the respective issues should be resolved. *Linn v. Garcia,* 531 F.2d 855 (8th Cir. 1976); *Griggs v. Firestone Tire & Rubber Co.,* 513 F.2d 851 (8th Cir. 1975); *Schneider v. Chrysler Motors Corp.,* 401 F.2d 549 (8th Cir. 1968); *Hanson v. Ford Motor Co.,* 278 F.2d 586 (8th Cir. 1960). *See also* 9 Wright & Miller, Federal Practice & Procedure § 2524.

### I. Authority.

The plaintiffs contend that Ezrine had no authority to bind Great Oil Basin because he was never elected to the presidency of the corporation or to its Board of Directors or to any other office or position and that he was simply an interloper. It is also contended that the corporate Board of Directors never in fact authorized the transaction under consideration.

The record contains a copy of a resolution purportedly adopted by the Board of Directors on August 11, 1969 which authorized the taking out of the loan and the execution of the note, deed of trust and other loan papers by the president and secretary of the company. That resolution was regular on its face. It was certified by Ms. Wellner, and there seems to be no question that she was the secretary of Great Oil Basin.

Whether Ezrine was in fact the president of the corporation or not, there was evidence from which the jury could find that he was in full and active charge of the affairs of the corporation, that he held himself out as president, that the Bank's representative, Mr. Jameson, made the usual inquiries as to the authority of Ezrine and was reliably assured that Ezrine had

---

**3.** Operation of the judgment was suspended pending appeal.

**4.** The foregoing statement of the case is a somewhat simplified one, but we consider it sufficient for purposes of this opinion.

ample authority in matters affecting Great Oil Basin and its property.

The district court dealt fully with this phase of the case in its memorandum opinion. It concluded that the record appeared to establish as a matter of law that Ezrine lacked actual authority to act for the company, but the district court was also of the view that there was substantial evidence from which the jury could find that he had apparent authority to act, and that his action was binding on the corporation.

We have considered the record, and we agree with the district court that the Bank made a submissible case on the question of Ezrine's apparent authority, that the jury's finding of apparent authority was supported by substantial evidence, and that the question as to his actual authority was moot. Hence, plaintiffs' contention based on Ezrine's lack of authority will be rejected.

II. *Usury.*

As indicated, plaintiffs contend that Great Oil Basin's obligation to the Bank was, as a matter of law, tainted with what may be called "collateral usury," that is to say usury not apparent from the face of the obligation. The question of whether the Bank's note was usurious in that sense must be resolved by reference to Arkansas law.

■ Under that law the burden was on the plaintiffs to establish by a preponderance of the evidence that the Bank contracted for value, amounting to interest, for the use of its $500,000.00 which, if added to the 9% interest called for by the note, would make the effective interest received by the Bank exceed 10% per annum, and that it so contracted, if at all, with usurious intent. *Brown v. Central Arkansas Production Credit Ass'n,* 256 Ark. 804, 510 S.W.2d 571 (1974); *Hayes v. First Nat'l Bank of Memphis,* 256 Ark. 328, 507 S.W.2d 701 (1974); *Davidson v. Commercial Credit Equipment Corp.,* 255 Ark. 127, 499 S.W.2d 68 (1973); *Peoples Loan & Investment Co. v. Booth,* 245 Ark. 146, 431 S.W.2d 472 (1968).

■ "Usurious intent" is not necessarily an intent to violate the usury laws as such. It is sufficient if it appears that the lender knowingly sets out to receive for the use of his money compensation in excess of the interest permitted by law. *Davidson v. Commercial Credit Equipment Corp., supra; Brooks v. Burgess,* 228 Ark. 150, 306 S.W.2d 104 (1957).

■ The controlling intent is that of the lender. It is not necessary that there be a concurrence of an intent on the part of a lender to receive usury with an intent on the part of the borrower to pay excessive interest. Indeed, the borrower is frequently unaware that he is being subjected to an unlawful interest charge, and this is particularly true in the case of persons who have little familiarity with matters of finance. *See Harris v. McCann,* 229 Ark. 972, 319 S.W.2d 832 (1959); *Brooks v. Burgess, supra; Schuck v. Murdock Acceptance Corp.,* 220 Ark. 56, 247 S.W.2d 1 (1952); *Jones v. Phillippe,* 135 Ark. 578, 206 S.W. 40 (1918).

■ Plaintiffs first argue that the loan should be treated as one of $200,000.00 rather than as one of $500,000.00. We agree that if the loan is so treated it is usurious even if the interest to be paid by the Bank on the CD is taken into account. We do not think, however, that the loan can be so characterized. Great Oil Basin was not required to leave $300,000.00 of the loan proceeds in the Bank at 6.25% interest while paying interest at 9% on $500,000.00. The borrower received the full benefit of the $500,000.00; the $300,000.00 came from an outside source.

Plaintiffs next contend, and this seems to be their principal argument, that the CD (more properly, the funds represented by it) was of substantially more value to the Bank than the $18,750.00 that it was required to pay as interest on the certificate, that the excess value should be treated as interest, and that the excess was more than $5,000.00, which is the difference between the 9% interest called for by the note and the 10% which was the maximum rate authorized by Arkansas law.

It is asserted that this excess value may be measured in either one of two ways. It is first said that the excess may be measured by the $9750.00 commission that Great Oil Basin paid the brokerage firm for use of the CD. Alternatively, it is claimed that the excess can be determined by reference to the gross profit that the Bank allegedly made from the use of the funds represented by the certificate. By one method of calculation the excess would be $8250.00 and by another method the excess would be $5250.00.

The district court instructed the jury that in determining whether the Bank contracted to receive more than 10% interest on the loan it might take into consideration the value of the CD to the Bank. However, the jury was also told that if it found that the Bank did not receive any part of the commission paid to the broker, it should not consider the commission at all. Since it is undisputed that no part of the commission was paid to the Bank, the district court's instruction just mentioned actually took the $9750.00 commission out of the case while leaving for the jury's consideration plaintiffs' gross profit theory.

■ We agree with the district court that the value of the CD to the Bank was not properly to be determined by what the borrower paid the broker for the CD even if it be assumed that $9750.00 was a reasonable commission or that it represented the "market value" of the use of a one year $300,000.00 certificate of deposit at 6.25% to a prospective borrower from a bank which needed to obtain the certificate in order to receive the loan. The value of the certificate to the borrower and the value of the certificate to the Bank are simply two different things.

Passing on to plaintiffs' other method of valuation, there is no question that the receipt of the money evidenced by the CD immediately increased the cash funds of the Bank and replenished by 60% the depletion of those funds that resulted from the making of the $500,000.00 loan. There is also no question that the funds were commin-gled with other funds of the Bank, that they were used in the Bank's business, and that the profit or loss from their use was reflected in the Bank's profit and loss statement for the applicable accounting period. There is, of course, no way to determine how much the Bank gained or lost from the use of those particular funds.

We are dealing here with a brokered time deposit. The requirement of such a deposit resembles the requirement commonly made in connection with large loans, and particularly in cases where such a loan is made to one who is not a regular customer of the bank and whose principal place of business is outside the trade area normally served by the bank, that the borrower maintain a "compensating balance" in the bank during the life of the loan.

There are, however, differences between a time deposit requirement and a compensating balance requirement. The compensating balance is usually kept in a demand checking account and draws no interest; additionally, the requirement is usually that an "average" balance be maintained, and the actual balance may vary somewhat from time to time; and in practice such requirements may not be enforced rigorously. In the case of a time deposit or a deposit evidenced by a CD, whether brokered or not, the money remains on deposit for the life of the loan, and the bank pays interest on it. If a loan characterized by a CD requirement is paid off in full when it falls due, the borrower has received the full amount of the loan for the life of the obligation; the lender receives its principal and interest plus what gain, if any, it has derived from the use of the deposited funds; and if the CD was brokered, the broker has received his compensation. If the note is not paid, the borrower has still had the use of the borrowed money, the broker has received his commission, and the bank is out its loan principal and interest plus the interest that it paid on the CD either to the borrower or to the third person furnishing the funds represented by the CD.[5]

---

5. Compensating balances, time deposits and brokered deposits are discussed in some detail in M. Mayer, The Bankers, Weybright & Talley, New York, 1974, at pp. 35, 95–96, 163–65, 175, 181–85, 190–97 and 290–95.

The long line of Arkansas cases dealing with usury establishes that the public policy of that state against usury is a strong one, and obligations of several types have been held usurious where it appeared that the effective rate of interest charged by the lender was in excess of 10% per annum. As a class, those cases, some of which are cited in the briefs of the parties and some of which are mentioned in this opinion, have dealt with concealed interest charges that the debtor was required to pay personally; the devices used by creditors and found to be usurious have included excessive discounting, the inclusion of interest as part of principal with the borrower being required to pay off the loan in equal or essentially equal periodic installments over a period of time, and the requirement that the borrower pay in addition to stipulated interest at or close to the maximum legal rate a commission to the lender or his agent in order to obtain the loan.

In *First Nat'l Bank in Mena v. Nowlin,* 374 F.Supp. 1037 (E.D.Ark.1974), *aff'd,* 509 F.2d 872 (8th Cir. 1975), which was a test case, it was held that the plaintiff national bank had been guilty of usury in discounting installment paper where the loan was to be repaid in equal monthly installments and in "adding on" interest to the principal sum of another obligation which was to be retired by monthly payments over a three year period.

In *Sosebee v. Boswell,* 242 Ark. 396, 414 S.W.2d 380, cert. denied, 389 U.S. 953, 88 S.Ct. 337, 19 L.Ed.2d 363 (1967), a case on which plaintiffs rely rather heavily, a majority of the Supreme Court of Arkansas held that a profit exacted by a lender must be treated as interest if the profit depends upon a contingency not within the control of the borrower, and that a money lender cannot charge the borrower in addition to maximum legal interest a fee designed to cover the lender's overhead expenses and costs of doing business. That case, however, did not involve a bank loan, and the requirement imposed by the lender in that case is distinguishable from the requirement involved here.

The view has been taken that a bank in Arkansas may not legally "require a borrower to open a checking or savings account nor to buy a certificate of deposit as an express identifiable condition of getting a specific loan when the interest on the loan plus the value of the use of the deposited funds gives the bank an over-all return on its loan in excess of 10%." Mitchell, *Usury in Arkansas,* 26 Ark.L.Rev. 263, 276 (1972). While the writer cites *O'Brien v. Atlas Finance Co.,* 223 Ark. 176, 264 S.W.2d 839 (1954), and *Commercial Credit Plan v. Chandler,* 218 Ark. 966, 239 S.W.2d 1009 (1951), as underlying his opinion, he concedes that no Arkansas case "decides the issue dispositively." *Ibid.* We agree.

In the light of the strong public policy of Arkansas against usury,[6] we think that the requirement with which we are concerned is suspect, and we do not give carte blanche legal approval to the requirement or to others comparable to it. On the other hand, we are not prepared to say that such a requirement automatically or as a matter of Arkansas law makes the affected obligation usurious simply because the lender may derive more money from the over-all transaction than he would have received had he made the loan at the maximum legal rate of interest with no strings attached. In a case of this kind usury depends on the amount gained by the lender as a result of

---

**6.** We note that efforts that have been made by lenders in Arkansas in recent years to bring about the repeal or amendment of Article 19, § 13 of the Arkansas Constitution have not been successful. National banks in Arkansas gained substantial relief, however, when Congress in 1974 amended 12 U.S.C. § 85. Under that amendment if an Arkansas national bank makes a business or agricultural loan of $25,- 000.00 or more it may charge the maximum Arkansas rate of 10% or it can charge a rate not in excess of 5% above the prevailing rediscount rate set by the Federal Reserve Bank of St. Louis. Thus, if such a bank makes say a $30,000.00 business loan at a time at which the rediscount rate is 8%, the bank may charge not more than 13% per annum on the obligation.

the use of the deposited or maintained funds and also upon the intent of the lender when it imposed the requirement.

In the instant case the district court thought that it was for the jury to decide whether the Bank stood to earn more than $5,000.00 on the loan in addition to the 9% interest called for by the note and whether the Bank acted with usurious intent when it required Great Oil Basin to furnish the CD.

While we think that the jury could have found from the evidence that the Bank charged and expected to earn more than 10% on the over-all transaction, we do not think that the evidence in the case favorable to the plaintiffs was so strong as to require the district court to take the usury issue away from the jury. The evidence on the part of the plaintiffs as to what the Bank actually earned or stood to earn on the CD was not as strong as it might have been, and, aside from that, we think that the jury could have found that the CD requirement was imposed not for the purpose of collecting additional interest or profit but simply to enable the Bank to make the $500,000.00 loan originally.

### III. Extent of Relief Granted.

On this phase of the case it appears to us that plaintiffs are complaining about Findings Nos. 3 and 5 of the district court and about the third paragraph of the formal judgment of that court.

Finding No. 3 recites that all defenses available to Great Oil Basin against the Bank with respect to the note and deed of trust would be foreclosed by the judgment to be entered. That finding also recites that the Bank sought no affirmative relief in the action and had not waived its right to enforce the power of sale appearing in the deed of trust.

Finding No. 5 recites that the deed of trust "is entitled to foreclosure under Texas law, at the option of the bank, and all defenses to such foreclosure have been concluded by the judgment to be entered herein."

The third paragraph of the judgment established the validity of the note and deed of trust and recited that the deed of trust is enforceable by foreclosure in Texas.

It is obvious from the findings and judgment and from certain other parts of the record that as of late February, 1975 the district court and counsel for the Bank contemplated that the Bank would satisfy its judgment, if any, in whole or in part by exercising the power of sale appearing in the deed of trust, and that the sale would be conducted in Texas.

It appears, however, that with the passage of time counsel for the Bank overlooked a letter agreement entered into between counsel for the respective parties on April 10, 1972, shortly after the litigation had been transferred to Arkansas from the Northern District of Texas. That agreement provided, among other things, that a certain suit pending in Ector County, Texas would be dismissed, and that the Bank would foreclose "only by judicial decree in the pending litigation in Little Rock."

After judgment was rendered, and before operation of the judgment was stayed, the Bank made an effort to exercise its power of sale and was confronted with the agreement just described. The Bank then filed its Countermotion seeking judicial foreclosure, and the plaintiffs filed their Opposition to the Countermotion.

Plaintiffs argue that under the pleadings the Bank is not entitled to judicial foreclosure and that it was not entitled to the original judicial determination that all of Great Oil Basin's defenses to the claim of the Bank have been concluded and that the Bank is entitled to exercise the power of sale contained in the deed of trust. In the latter connection plaintiffs assert that exercise of the power is now barred by Article 5520 of the Revised Civil Statutes of Texas which prohibits the exercise of a power of sale appearing in a mortgage or deed of trust more than four years after the creditor's cause of action accrues. If the Bank cannot obtain a judicial foreclosure, and if it can no longer exercise its power of sale, it may have no effective way in which to

collect the unpaid balance of its note and the interest thereon.

Since it does not appear that the district court has ever ruled on the Bank's Counter-motion or the Opposition thereto, the case will be remanded to the district court to consider those pleadings and to make appropriate disposition of the issues tendered by them.

We express no opinion as to the extent to which questions that perhaps should have been raised prior to or in the course of the trial may now be litigated, and we express no opinion as to the merits of the contentions that may be advanced by the parties in the course of the remand. One possible question that we might mention is the extent to which the court below sitting in Arkansas can effectively order a foreclosure of a lien created by a deed of trust covering Texas realty where the problem arises in a case transferred from Texas to Arkansas and where the parties have agreed that the lien might be foreclosed in an Arkansas court, if at all. *See* in general 55 Am. Jur.2d *Mortgages* §§ 560–561, and cases collected in an annotation appearing in 42 A.L.R. 470 *et seq.* If in the eyes of the district court that question appears to be serious, the district court might consider among other things retransferring the case to the Northern District of Texas for final disposition.

As to the issues of authority and usury, the judgment of the district court is affirmed. The case is remanded for further proceedings not inconsistent with this opinion.