COMMERCIAL BANK AND TRUST COMPANY, Plaintiff,

v.

DIXIE SOUND & COMMUNICATIONS, INC., Durfold, Inc., W. H. Barbour, Sr., Thomas Boyd Kellum, Jr., Thomas Boyd Kellum, Sr., William Stacey Kellum and Jane Kellum, Defendants.

No. PB–76–C–226.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

March 12, 1979.

O. H. Storey, III, Paul W. Hoover, Jr., Little Rock, Ark., for plaintiff.

Isaac A. Scott, Jr. of Wright, Lindsey & Jennings, Herbert C. Rule, III of Rose, Nash, Williamson, Carroll, Clay & Giroir, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

HARRIS, Senior District Judge.

This is an action for judgment on certain promissory notes against two corporations and several individuals and for foreclosure of the liens of a real estate mortgage and security agreements executed to secure said notes.

Pursuant to pre-trial and regular setting, this cause came on to be heard by the Court, without the intercession of a jury, on October 17, 1978. Plaintiff, Commercial Bank and Trust Company ("Commercial"), was represented by Hon. Paul W. Hoover, Jr. and Hon. O. H. Storey, III. Defendants Dixie Sound & Communications, Inc. ("Dixie"), Durfold, Inc. ("Durfold") and W. H. Barbour, Sr. were represented by Hon. Isaac A. Scott, Jr. Defendants Thomas Boyd Kellum, Sr., Thomas Boyd Kellum, Jr., William Stacey Kellum and Jane Kellum, were represented by Hon. Herbert C. Rule, III.

All parties announced ready for trial, whereupon the Court heard and received evidence in the form of testimony, depositions, answers to interrogatories, and numerous exhibits on October 17, 1978 and on November 8 and 9, 1978. At that time, all parties rested, with the record being left open to receive certain answers to interrogatories, which have since been filed and received in evidence. The matter was then taken under advisement pending the filing by counsel of briefs and proposed findings of fact and conclusions of law.

All proposed findings and conclusions and the briefs of counsel for all parties have been received and the cause is submitted for determination. After careful consideration of the pleadings, the evidence, the proposed findings and conclusions, and the excellent briefs of counsel, the Court makes the following findings of fact and conclusions of law, which are incorporated herein

pursuant to Rule 52, Federal Rules of Civil Procedure:

Plaintiff, Commercial Bank, is a banking organization organized pursuant to the laws of the State of Arkansas and having its principal offices and place of business within the Eastern District of Arkansas. Defendant Dixie is a corporation organized under the laws of the State of Alabama, with principal offices and place of business in either Georgia or Mississippi. Defendant Durfold is a corporation organized under the laws of the State of Alabama, with principal offices and place of business in Mississippi. W. H. Barbour, Sr., Thomas Boyd Kellum, Sr., Thomas Boyd Kellum, Jr., William Stacey Kellum and Jane Kellum are each resident citizens of the State of Mississippi. There is, therefore, complete diversity of citizenship of the parties plaintiff and defendant and, the amount in controversy being far in excess of $10,-000.00, exclusive of costs and interest, the Court has jurisdiction of the cause pursuant to 28 U.S.C. § 1332.

Prior to commencement of the trial on the merits, the Court reserved a ruling on a motion to quash process as to the defendant, Thomas Boyd Kellum, Jr., pending further evidence as to the extent of his contacts with the State of Arkansas. Service is predicated upon Rule 4, F.R.C.P., and Ark.Stats.Ann. § 27–2502, which has been held intended to extend in personam jurisdiction to the maximum extent allowable within the bounds of due process, *Martin v. Kelley Electric Co.,* 371 F.Supp. 1225 (E.D. Ark.1974).

■ The action arose out of a loan transaction which was consummated in the State of Arkansas. While Kellum, Jr., probably did not execute the instruments which he signed as an individual within the State of Arkansas, he did cause them to be delivered within this State by an agent. Without his personal guaranty agreement and his hypothecated shares of stock of Durfold, the loan would not have been acceptable to the FmHA conditions for their guarantee and the transaction would not have been entered into. Further, Kellum, Jr., did personally enter the State of Arkansas on at least one occasion in connection with the purchase of the building, lands and equipment involved and in determining whether the loan should be entered into. The Court finds that there exist at least the minimum contacts requisite to due process of law, and that the motion to quash process as to Mr. Thomas Boyd Kellum, Jr., should be denied.

Crown Industries, Inc., had borrowed a sum of money from Citizens Bank of Tillar, Arkansas, which loan was secured by a second lien on certain land, buildings and equipment located at Dumas, Arkansas where Crown had manufactured mobile homes. Crown defaulted on the loan and filed a proceeding in bankruptcy. Mr. Bennie Ryburn, Sr., the owner of a controlling interest in Citizens Bank, was the high bidder at the auction sale of the land, buildings and equipment, having bid the sum of $210,000.00 for the realty and $50,492.00 for the equipment.

Citizens Bank had an outstanding claim against the Crown bankruptcy estate of some $85,000.00, which was secured as a second lien, subordinate to a prior lien amounting to some $185,000.00. These figures are approximate, but indicate and raise an inference that the bid by Mr. Ryburn was on behalf of the Citizens Bank, for the purpose of paying off the first lien and purchasing for an amount within which the Citizens Bank would receive back all funds paid over the first lien amount on its second lien claim. This would enable Citizens Bank to attempt to sell the assets free of the prior lien to recoup any loss on its loan to Crown. Of course, there would be no recoupment unless the assets could be sold for at least as much as was paid for them.

The Ryburn bid was made January 9, 1975. By assignment of February 28, 1975, Mr. Ryburn transferred his rights to the assets of Crown to Citizens Bank. Mr. Ryburn was highly interested in obtaining a purchaser for the Crown assets for many reasons. He wished to avoid a loss to the Citizens Bank, of which he was a substantial owner. He wished to restore to the economy of the area an industrial payroll, if

possible, for the benefit of the communities and his business enterprises in the area. He also wished, if possible, to make a profit on the transaction.

An accountant, with whom Mr. Ryburn had recently become acquainted and had business dealings, Mr. W. B. Holloway, was the accountant for Durfold and Dixie, and was well acquainted with Mr. Thomas Boyd Kellum, Sr., and the other officers and principals of these corporations. Mr. J. Ted Blagg was an officer and attorney for Commercial Bank, of which Mr. Ryburn was also substantial owner and officer. Mr. Holloway was informed of the status of the Crown Industries properties and was instrumental in bringing the parties into contact. The controlling officer of both Durfold and Dixie, Mr. Thomas Boyd Kellum, Sr., negotiated with Mr. Ryburn and Mr. Blagg for the acquisition of the Crown properties.

As a result of the negotiations, Mr. Blagg, individually, and Mr. Holloway, on behalf of Dixie, entered into an option agreement under which Dixie would purchase the Crown assets from Blagg. The trustee in bankruptcy then executed and delivered to the Citizens Bank a deed to the realty and a bill of sale to the personalty comprising the Crown assets. In September of 1975, Citizens Bank and Mr. Blagg entered into a contract under the terms of which Blagg would purchase the Crown assets individually for a price of $397,850.38, or some $137,000.00 more than the price paid the trustee by Citizens Bank for the same assets.

Citizens Bank had been directed by Bank Department auditors to divest itself of the Crown assets by the end of the year, and on December 31, 1975, the Citizens Bank transferred these assets to Mr. Blagg.

During this time, negotiations had proceeded among the parties with regard to the ultimate purchase of the assets by Dixie. Dixie intended to operate a manufacturing plant on the location, and was in need of financing both for the purchase of the assets and for working capital. It was agreed that the Commercial Bank would make such financing available, provided that a guarantee of 90% of such a loan could be obtained from Farmers Home Administration under the Rural Development Program. Extensive applications and correspondence were conducted with FmHA by Commercial, primarily with Mr. George Estelle, who was then chief of the business and industry loan division of FmHA at Little Rock, Arkansas.

It was agreed among Dixie, Mr. Ryburn and Mr. Blagg that the sales price of the assets would not exceed the amount which the FmHA would loan on it, to be determined by appraisal. There was mention made during these negotiations that the appraisal would be one made by an "MAI" appraiser, that is, an appraiser certified as a member of a nationally recognized organization which tests and regulates real estate appraisers. In fact, the appraisal received by FmHA was made by a highly qualified and experienced real estate appraiser who was certified by another nationally recognized organization which tests and regulates real estate appraisers, the Society of Industrial Realtors, and also the National Association of Independent Fee Appraisers.

As finally agreed among the parties, since the amount of the appraisal exceeded the amounts discussed, the land and the buildings of the Crown Industries assets were to be sold to Dixie by Blagg for $400,-000.00 and the fixtures and equipment for an additional $60,000.00. Although the appraisal shows on its face that it is not made by an "MAI" appraiser, no protest of the lack of an "MAI" appraisal was ever made by Dixie or anyone acting for the company prior to the filing of this action. As this Court has noted from past experience, it is not at all unusual for two or more equally well qualified, certified, well-experienced and skilled professional appraisers to arrive at substantially different opinions as to the value of the same parcel of property. The introduction of an "MAI" appraisal of substantially lesser opinion as to the value of the property than that of Mr. Larrison does not support the contention of the defendants that the difference between the two appraisals should be determined and added

to the interest received by the Commercial Bank on the loan, to render the loan usurious.

Dixie and its representatives had full access to the real and personal property intended to be purchased, with full opportunity to make their own determination as to its value, to have it appraised for their own account, to view and review the Larrison appraisal report, and to insist at that time, if that was their desire, that an appraisal be secured from an "MAI" appraiser. There is no suggestion of fraud or collusion between Mr. Larrison and Mr. Blagg and Mr. Ryburn as to the amount of the appraisal. Defendants urge that any profits that may have inured directly or indirectly to Mr. Blagg and Mr. Ryburn and another associate of theirs who was involved in the transaction, Mr. Bruce Gresham, should be charged to the Commercial Bank as additional interest on the loan.

While Mr. Blagg, Mr. Ryburn and Mr. Gresham intended to and did make a substantial profit in the transaction, such profits as were made or anticipated to be made by them as individuals were not a part of the interest charged or received by the Commercial Bank as interest on the loan transaction. The Arkansas Supreme court in *Mid-State Homes, Inc. v. Knight,* 237 Ark. 802, 376 S.W.2d 556 (1964), determined that the profit made by a seller, even one intimately connected with the lender, has no bearing upon the issue of usury, which is defined as an excessive charge for the loan or forebearance of money.

Mr. Blagg, Mr. Gresham and Mr. Ryburn, after the sale and loan had been consummated, agreed among themselves as to the division of the profits from the transaction, and placed a part of the profits in certificates of deposit at the Commercial Bank. They further agreed that, should any loss befall the Bank as a result of the loan, they would utilize a part of their profits to make up any such loss. The placing of the profits in certificates of deposit, and the agreement among themselves that they would indemnify the Bank against possible loss are not in any way sufficient to convert the profits of these individuals into interest chargeable to the Bank.

Three promissory notes in principal sums of $486,500.00, $613,500.00 and $400,000.00 were made by Dixie on February 4, 1976, in favor of Commercial Bank. From the proceeds of these notes, which totalled $1,500,000.00, $400,000.00 was paid to Union National Bank of Little Rock through Commercial Bank to pay Blagg's note there, for purchase of the lands and the buildings. $60,000.00 was paid to Bruce Gresham for purchase of the equipment, which is the amount just previously discussed.

Commercial Bank and FmHA had discussed the requirements of FmHA for controls on expenditures of the proceeds of the notes. FmHA insured 90% of the loan, and as a condition of the insurance, FmHA regulations required that the proceeds be utilized for the purposes of Dixie. At the insistence of FmHA, as a condition of the guaranty by FmHA, the proceeds were placed in accounts from which withdrawals could be made only with a counter-signature by Mr. Blagg for the Commercial Bank, acting as a controller of withdrawals pursuant to the condition of the guaranty imposed by FmHA.

Due to the fact that a part of the proceeds would not be used immediately, at Commercial Bank's suggestion, a part of the proceeds were used to purchase interest bearing certificates of deposit. It is contended by defendants that the requirement for the counter-signature for withdrawals and the use of part of the proceeds to purchase C.D.s amounted to the exaction of additional monetary benefits for the loan by Commercial, and that such benefits should be classified as additional interest.

The Court finds that the requirement of the counter-signature and restrictions on withdrawals were not conditions imposed by Commercial, but conditions of the guaranty imposed by FmHA. This was a method chosen by FmHA to insure that the loan proceeds would be utilized for the purposes represented in the application for guaranty, and agreed to by Dixie. The funds being on deposit in noninterest-bearing accounts

in the Commercial Bank, where they must remain until withdrawn for purposes approved by FmHA, the Court can see no benefit to the Commercial in the conversion of these checking account deposits into certificates of deposit. The certificates would bear interest to be paid by Commercial, whereas the checking account balances would have earned no interest. This was to the benefit of Dixie, not Commercial Bank.

■ The Court concludes that events occurring subsequent to the loan being completed and the funds disbursed by the Bank to Dixie's account are not a part of the loan transaction, and cannot be taken into account in determining whether usury is present. Further, the conditions imposed upon withdrawals of the funds deposited in Dixie's accounts were a condition of the guaranty, not a condition of the loan, and were imposed and regulated by FmHA, not Commercial. Mr. Blagg's counter-signature was in his capacity as controller of disbursements for FmHA, not in his capacity as an officer of Commercial.

Under the circumstances, there was nothing whatever to prevent or hinder Dixie from withdrawing the entire amount of the loan proceeds on the date the loan was closed, other than the requirement of the guarantor, FmHA, that the proceeds be used only for the purposes for which the loan was made. The only amount requested by Dixie to be disbursed which was not promptly granted was the final request made about June 2, 1976, when questions had been raised with both Commercial and FmHA as to the authenticity of Mr. Barbour's signatures on the loan papers and the default by Dixie in furnishing financial statements as required was apparent. Not surprisingly, this request was not granted.

The Court, therefore, concludes that as between Dixie and Commercial the loan proceeds were fully disbursed to Dixie and that there was no intent on the part of Commercial to receive for the use of the money loaned any compensation in excess of the interest permitted by the law of Arkansas. The subsequent events do not indicate such an intent on the part of Com-

mercial. See *Brown v. Central Ark. Production Credit Ass'n*, 256 Ark. 804, 510 S.W.2d 571 (1974); *United-Bilt Homes, Inc. v. Teague*, 245 Ark. 132, 432 S.W.2d 1 (1968); *General Contract Corp. v. Duke*, 223 Ark. 938, 270 S.W.2d 918 (1954).

The Court is asked by defendants to seize up the profits made by Ryburn, Blagg and Gresham and apply their profits to the repayment of the notes of Dixie and Durfold. These three individuals, while closely connected with Commercial, are not parties to this action. They have not been served with any pleadings herein, have had no opportunity to defend any of the allegations made in the briefs of defendants, and this Court has no jurisdiction over them. This prayer of defendants is without merit, as it offends every principle of due process.

W. H. Barbour, Sr., is a majority shareholder of Durfold. His signature appears on a guaranty agreement, and it is contended that his signature thereon, and on other instruments in the loan applications and loan papers, is forged. Pursuant to Ark. Stats.Ann. § 85–3–307, when the genuineness of a signature is put in issue the burden of establishing it is on the party claiming under the signature; but the signature is presumed to be genuine or authorized.

■ From all of the evidence, the Court finds that Mr. Barbour has overcome the presumption of genuineness and that the signatures appearing on the loan instruments are forgeries made without knowledge or authorization of Mr. Barbour. The Court, therefore, concludes that Mr. Barbour is not liable personally to Commercial upon the notes or the guaranty agreement. Ark.Stats.Ann. § 85–3–401(1).

Defendants next contend that Dixie and Durfold are not liable to Commercial on the notes because Thomas Boyd Kellum, Sr., and William Stacy Kellum who made the notes on behalf of Dixie and Thomas Boyd Kellum, Sr. and Jane Kellum, who made the notes on behalf of Durfold, were not authorized by the respective corporations to make indebtedness, notes or mortgages for the corporations. This is the most serious ques-

tion presented and its answer is not nearly so evident as have been the issues previously discussed.

█ The general rule is that the burden of establishing the authority of an agent is on the party contending that the act was authorized. *Johnson v. Mosley,* 179 F.2d 573 (8 Cir. 1950). A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases. Ark.Stats.Ann. § 85–3–403(1). The burden of establishing the effectiveness of a signature is on the party claiming under it, but the signature is presumed to be authorized. Ark.Stats.Ann. § 85–3–307.

█ Thomas Boyd Kellum, Sr., was the managing officer of Durfold, although he held the title of vice-president, rather than the title of president. From the time the corporation was acquired by Barbour and Kellum, Kellum was in full control of the entire operation, merely reporting periodically to Mr. Barbour. His control of the operations was well known to Mr. Holloway, who introduced Kellum to Ryburn, Blagg and Commercial. Kellum and other officers of Durfold conducted the entire transaction with Blagg, Ryburn, Commercial and FmHA. Under Kellum's signature on behalf of Durfold, large sums had already been loaned to the corporation and repaid.

It was evident to all appearances that Kellum was in complete charge of both Durfold and Dixie, of which he was the president. During the course of the negotiations and the loan transaction, Kellum was certified by corporate resolutions of both Durfold and Dixie, regular on their face, bearing the seal of the corporations and the attestation of the secretary of the corporations, to be expressly authorized to enter into the transactions and execute the instruments on behalf of the corporations.

Personal guaranty agreements of some of the shareholders, with apparently valid, notarized signatures and accompanied by properly endorsed certificates of stock of the corporations were also produced as a part of the transaction. W. H. Barbour, Sr., an experienced and capable attorney, was in a position through the stock ownership of himself and his family to fully control the actions of the corporations and their officers.

The record is clear that he did not choose to exercise this right to control, but completely entrusted the operations of the corporations to Mr. Kellum. He relied upon Kellum to keep him informed of the operations by periodic reports. He did not perform his duty as a director to supervise and maintain control and set policy and direction for the management, or set up any procedures for regulation or control of the management and operations of the corporations. He did not check the corporate books or even conduct annual meetings.

Despite Mr. Barbour's statements that he had expressly forbidden Kellum to create indebtedness on behalf of the corporations, he took no steps whatever to place any practical limitation on Kellum's apparent authority or to place any one within or without the corporations on notice of such limitations. From the evidence, the Court concludes that Thomas Boyd Kellum, Sr., was permitted at least apparent authority to act on behalf of the corporations by the acts and failures to act of the other shareholders, directors and officers of the two corporations. See *McAdoo v. Union Nat. Bank,* 535 F.2d 1050 (8 Cir. 1976), for a similar situation resulting in the same conclusion.

█ In addition to the apparent authority held by Kellum, the Court finds and concludes that the two corporations have ratified the transaction and instruments sued upon, and that they are estopped to deny the authority of Kellum to bind the corporations. It is evident that the Barbour family has now acted to take effective control of the two corporations from the Kellum family, and that this action was taken only a short time subsequent to Barbour's discovery of the loan and the forged signatures. At no time have the corporations made any tender or filed any pleading indicating that the transactions should be

set aside as void and the parties restored to their status prior to the transaction.

Dixie has title to the lands, buildings and equipment and has had the benefit of the moneys borrowed, a majority of which has been spent. Durfold, the parent corporation, not only benefited as the owner of Dixie, but used a part of the loan proceeds directly. The corporations have at all times insisted that they are entitled to keep the land, buildings, equipment and the loan proceeds. They have further, by their pleadings and contentions, sought to cancel the mortgage and liens on the property of the corporations. Far from seeking to repudiate the transactions, they have sought to accept all of the benefits of the purchase and notes and to escape all of the burdens.

■ The law of Arkansas recognizes that implied ratification of unauthorized acts of an agent is inferred from a failure to repudiate the acts after acquiring full knowledge thereof, and particularly where the principal receives and retains the benefits of the transaction with knowledge of facts sufficient to put the principal on notice of the agent's unauthorized acts. *Arnold v. All American Assurance Co.,* 255 Ark. 275, 499 S.W.2d 861 (1973).

The law of the State of Mississippi, which may govern as to the authority of Kellum to bind the corporations, as it was the principal place of business and residence of the parties involved, is to the same effect. See *River Valley Co. v. Deposit Guaranty National Bank,* 331 F.Supp. 698 (N.D.Miss. 1971).

The Court, therefore, concludes that Dixie and Durfold are liable to Commercial for the unpaid balances of principal and interest on the three notes sued upon, that the notes are not void on account of usury, and that Commercial is entitled to judgment against the two corporations, as prayed. The mortgage and security interests securing such indebtedness are determined and found to be valid and binding upon the two corporate defendants and, should such judgment not be paid within 20 days from and after the date of entry thereof, the liens created thereby shall be foreclosed and the property sold pursuant to the law of the State of Arkansas, as to all of the property described therein located in this State.

Plaintiff must seek foreclosure of its security interests in property of the corporations located outside the State of Arkansas in an appropriate forum. Should the corporations be found insolvent or otherwise fail or refuse to satisfy the judgment herein, the judgment shall provide that Thomas Boyd Kellum, Sr., William Stacey Kellum and Jane Kellum, as officers of a corporation not authorized to do business in the State of Arkansas shall be personally liable for any deficiency pursuant to Ark.Stats. Ann. § 64–1216. It is expressly found that the two corporate defendants have not "qualified" to do business in Arkansas. Similarly, Thomas Boyd Kellum, Jr., shall also be held personally liable for any such deficiency, jointly and severally with the above named Kellums, by virtue of the guaranty agreement made by him in connection with the notes.

Judgment will also be entered in favor of plaintiff for a reasonable attorney fee and the costs of this action. The complaint against W. H. Barbour, Sr., will be dismissed for the reasons set out herein.

Counsel for plaintiff will prepare a precedent for the judgment of the Court and will confer with counsel for the respective defendants with regard to the amount of the attorney fee. Should counsel be able to reach agreement as to the form of judgment and the amount of fees, the form will be signed by counsel and submitted to the Court. Should counsel be unable to agree, counsel for plaintiff will submit the precedent for judgment to the Court together with a detailed justification for the amount of fees requested. Counsel for defendants will be permitted five days after such submission to object to the precedent furnished, submit suggested corrections and additions to the form, and any objections as to the amount of fees. The Court will then enter judgment in accordance with this opinion.